# FOR PUBLICATION

ATTORNEYS FOR APPELLANT/
CROSS-APPELLEE:

**GEORGE M. PLEWS**
**FREDERICK D. EMHARDT**
**KATHERINE E. WINDERS**
**JOSH S. TATUM**
**SEAN M. HIRSCHTEN**
Plews Shadley Racher & Braun LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE/
CROSS-APPELLANT CENTURY
INDEMNITY COMPANY f/k/a
INSURANCE COMPANY OF
NORTH AMERICA:

**DALE W. EIKENBERRY**
Wooden & McLaughlin LLP
Indianapolis, Indiana

**WILLIAM M. COHN**
**J. CHRISTOPHER MADDEN**
Cohn Baughman & Martin
Chicago, Illinois

ATTORNEYS FOR APPELLEE/
CROSS-APPELLANT XL INSURANCE
AMERICA, INC. f/k/a WINTERTHUR
INTERNATIONAL AMERICA INSURANCE
COMPANY:

**STEPHEN J. PETERS**
**DAVID I. RUBIN**
Harrison & Moberly, LLP
Indianapolis, Indiana

**MATTHEW S. PONZI**
**JAMES B. GLENNON**
Foran Glennon Palandech Ponzi & Rudloff PC
Chicago, Illinois

FILED
Jun 19 2014, 10:02 am
CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| THOMSON INC. n/k/a TECHNICOLOR USA, INC., | ) ) ) | |
| Appellant-Plaintiff/Cross-Appellee, | ) ) | |
| vs. | ) ) | No. 49A05-1109-PL-470 |
| | ) | |

INSURANCE COMPANY OF NORTH ) 
AMERICA n/k/a CENTURY INDEMNITY ) 
COMPANY, et al., ) 
         ) 
       Appellees-Defendants/Cross-Appellants, ) 
         ) 
         and ) 
         ) 
XL INSURANCE AMERICA, INC. f/k/a ) 
WINTERTHUR INTERNATIONAL AMERICA ) 
INSURANCE COMPANY, ) 
         ) 
       Appellee-Defendant/Cross-Appellant, ) 
         ) 
         and ) 
         ) 
TRAVELERS PROPERTY CASUALTY ) 
CO., et al., ) 
         ) 
       Appellee-Defendant/Cross-Appellant. ) 

---

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Michael D. Keele, Judge
Cause No. 49D07-0807-PL-30747

---

**June 19, 2014**

**OPINION – FOR PUBLICATION**

**CRONE, Judge**

### Case Summary

    In 2004, a group of former factory workers and their heirs filed a class-action lawsuit

in Taiwan ("the Taiwan Class Action") against Thomson Consumer Electronics Television

Taiwan Ltd. ("TCETVT"), a Taiwanese company which owned and operated an electronics

manufacturing plant in Taiwan from the late 1980s to 1992. The workers sought damages for

bodily injury allegedly resulting from exposure to organic solvents while working in the plant

and living in dormitories near the plant. Over 99% of TCETVT's stock is owned by Thomson Consumer Electronics (Bermuda) Ltd. ("TCEB"), and less than .01% is owned by Thomson Inc. n/k/a Technicolor USA, Inc. ("Thomson"), a Delaware corporation with its headquarters in Indiana. Both TCEB and Thomson are wholly owned subsidiaries of French electronics company Thomson SA.

The Taiwan Class Action was dismissed in 2005 and reinstated in 2006. In 2007, the plaintiffs attempted to name Thomson SA, TCEB, and Thomson as additional defendants based on corporate-veil-piercing and joint-liability theories. Those entities have not yet been served or entered an appearance in the Taiwan Class Action. In 2008, Thomson filed a declaratory judgment action against its primary and umbrella liability insurers, seeking defense and indemnification costs for the Taiwan Class Action. The primary insurers included XL Insurance America, Inc. f/k/a Winterthur International America Insurance Company ("XL") and Century Indemnity Company ("Century").[1] The umbrella insurers included XL and Travelers Casualty and Surety Company f/k/a The Aetna Casualty and Surety Company and Travelers Property Casualty Company of America f/k/a The Travelers Indemnity Company of Illinois (collectively, "Travelers").

In November 2009, Thomson filed a motion for summary judgment as to the primary insurers' duty to defend, which the trial court granted by interlocutory order in July 2010

---

[1] Century refers to the following insurance companies: Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America and as successor to Indemnity Insurance Company of North America; ACE Property & Casualty Company, f/k/a CIGNA Property and Casualty Company; and ACE American Insurance Company f/k/a CIGNA Insurance Company. The trial court and the other parties refer to Century as "ACE" or "the ACE Defendants."

("the Duty to Defend Order"). In the Duty to Defend Order, the trial court ruled that XL and Century have a duty to defend Thomson in the Taiwan Class Action and reimburse Thomson for reasonable and necessary defense costs, which would be determined later. The insurers asked the trial court to certify the Duty to Defend Order for discretionary interlocutory appeal, and Thomson asked the trial court to certify it as a final judgment. The trial court denied both requests.

In October 2010, Thomson filed a motion for summary judgment as to trigger, allocation, occurrence, and the absence of aggregates in the primary policies at issue. In August 2011, the trial court entered a partial final judgment in favor of Thomson on certain issues ("the Allocation Order"). Thomson, XL, and Century appealed from the Allocation Order.

In October 2011, Thomson filed a motion for summary judgment for defense costs against XL and for defense costs coverage against Travelers. In June 2012, the trial court granted Thomson's motion to amend its complaint to add TCETVT as a plaintiff. The trial court also entered a partial final judgment against XL ("XL Defense Costs Order") and a partial final judgment against Travelers ("Travelers Defense Costs Order") (collectively, "the Defense Costs Orders"). XL and Travelers appealed from the Defense Costs Orders. The appeals from the Allocation Order and the Defense Costs Orders were consolidated. In May 2014, Thomson notified this Court that it had reached a full settlement on all issues with Travelers and had reached a partial settlement with Century regarding Century's liability for

4

defending Thomson in the Taiwan Class Action. Travelers' appeal was dismissed,[2] and Century's appeal remained pending as to all indemnity issues.

The parties have raised numerous issues for review, which we have reordered and consolidated as the following eleven issues:

(1) XL contends that we should dismiss this appeal because the Duty to Defend Order is not a final judgment. We agree with Thomson that the Duty to Defend Order was essentially made final when the trial court issued the Defense Cost Orders. Therefore, we deny XL's request to dismiss.

(2) XL contends that the trial court erred in issuing the Duty to Defend Order because genuine issues of material fact remain as to the applicability of certain policy exclusions and defenses, such as the employer's liability exclusion and the known-loss doctrine. We affirm the trial court on this issue.

(3) Thomson contends that the trial court erred in ruling that there are only two "occurrences" under the XL and Century policies. We affirm the trial court on this issue.

(4) Thomson contends that the trial court erred in ruling that it must satisfy the deductible for each occurrence for XL's 2000, 2001, and 2002 primary policies. We affirm the trial court on this issue.

(5) XL contends that the trial court erred in failing to apply the self-insured retentions ("SIRs") in its 2003, 2004, and 2005 primary policies. We reverse and remand with instructions to do so.

(6) Thomson contends that the trial court erred in concluding that the "personal injury" provisions in XL's 2000 primary policy are inapplicable. We reverse the trial court on this issue.

(7) XL contends that the trial court erred in applying a "continuous trigger" to its policies and in using diagnosis of disease as the manifestation point for that trigger. We conclude that XL has waived any argument regarding

---

[2] Pursuant to Indiana Appellate Rule 17(A), a party of record in the trial court shall be a party on appeal, and therefore we have included Travelers in the case caption.

5

the applicability of a "continuous trigger" and therefore affirm on this issue. We conclude that the proper manifestation point is when the disease becomes reasonably capable of medical diagnosis and therefore reverse and remand on this issue.

(8) XL and Century contend that the trial court erred in using an "all sums" allocation method for their policies. We reverse and remand with instructions to use an appropriate pro rata allocation method.

(9) XL contends that the trial court erred in concluding that TCETVT and Thomson SA are insureds under its primary and umbrella policies. We affirm the trial court on this issue.

(10) XL contends that genuine issues of material fact exist regarding the reasonableness and necessity of Thomson's defense costs. We affirm the trial court on this issue.

(11) XL contends that the trial court erred in awarding prejudgment interest on the defense costs. We affirm the trial court on this issue.

In sum, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

**Facts and Procedural History**

The Taiwan Class Action plaintiffs have alleged that Radio Corporation of America ("RCA") was approved to operate in Taiwan ("RCAT") in 1967 and established an electronics manufacturing plant in Taoyuan by 1970. Thousands of employees lived in dormitories near the plant. In 1986, RCA and the Taoyuan plant were merged into General Electric International, Inc. ("GEI"). In 1987, RCA and RCAT were acquired by Thomson SA through its wholly owned subsidiaries, including TCEB and Thomson. RCAT's name was changed to TCETVT. TCEB has always owned approximately 99.98% of TCETVT, and Thomson has owned between four and sixteen shares, or approximately .003% to .005%, of

6

TCETVT.  TCETVT, a Taiwanese company, owned and operated the plant until it was sold to a local developer in 1992.  The plant was demolished in 2004 or 2005.

In April 2004, former plant employees and their heirs, who are members of a plaintiff association, filed a class-action lawsuit against TCETVT and GEI in Taiwan.  The plaintiffs in the Taiwan Class Action sought damages for claimed exposure to the organic solvents trichloroethylene ("TCE") and perchloroethylene ("PCE") from 1970 to 1992.  The original complaint alleged that TCETVT and GEI failed to properly train their employees regarding TCE and PCE and allowed them to improperly dispose of the solvents, which contaminated the soil and groundwater.  The complaint also alleged that bodily injury occurred to employees who had either died from cancer, been diagnosed with cancer, or are at increased risk of cancer because of their exposure to the solvents.  The plaintiffs later alleged that TCETVT employees were exposed to organic solvents in the plant through inhalation and dermal contact while soldering and dyeing and cleaning work tools and table tops, as well as through drinking contaminated groundwater.  The employees also used the contaminated groundwater for bathing, clothes washing, and drinking in the dormitories.

Since 1992, TCETVT has had no employees.  Thomson's general counsel, Meggan Ehret, has overseen TCETVT's defense in the Taiwan Class Action, and Thomson employee Richard Dyer has overseen environmental remediation at the Taoyuan plant that was ordered by Taiwanese authorities.  According to Ehret, TCETVT's only two activities are defending the lawsuit and overseeing the remediation.  TCETVT retained the law firm Kirkland & Ellis LLP to represent it in the Taiwan Class Action.  TCETVT later retained other firms,

7

including Alliance International Law Offices, Summit Law Group, PLLC, and the Taiwanese firm of Lee & Li. Ehret is responsible for reviewing and approving payment of invoices from the law firms and experts used in defending the Taiwan Class Action. TCETVT has paid its own defense costs.

According to attorney J. Chad Mitchell, who has represented the Thomson entities with Kirkland & Ellis and Summit Law Group, Thomson was aware of soil and groundwater contamination at the Taoyuan plant by February 1989. By 1994, Thomson was aware of allegations that the contamination had contributed to cancer in some plant employees. Approximately 3000 RCAT workers underwent physical examinations, and their claims for damages based on the examination results were rejected by Taiwan's Council for Labor Affairs in 1998. The Council also published studies concluding that there was no reliable scientific proof that working at the plant would lead to illnesses. Based upon his "interviews of current and former Thomson employees and experts and review of available documents," Mitchell believes that TCETVT did not use TCE or PCE at the Taoyuan plant "from at least 1987 until the plant closed in 1992." Thomson's AO Br. at 913.[3]

The Taiwan Class Action was dismissed on technical grounds in 2005 and reinstated in 2006. Taiwan uses an opt-in system for class actions. The number of plaintiffs in the Taiwan Class Action has fluctuated from over a thousand to just over a hundred and totaled 529 in late 2007. In August 2007, the plaintiffs attempted to name Thomson SA, TCEB, and

---

[3] The parties' briefs and appendices relating to the Allocation Order are designated "AO." The briefs and appendices relating to XL's Defense Costs Order are designated "XO."

8

Thomson as additional defendants based on corporate-veil-piercing and joint-liability theories.[4] The service of the amended complaint began in October 2007 but is not complete, and neither Thomson SA, TCEB, nor Thomson has appeared in the Taiwan Class Action. The success of various defenses asserted by the Thomson entities (such as failure of service, lack of personal jurisdiction, and untimeliness) likely will not be known until the end of the case.

On July 8, 2008, Thomson notified its primary insurers about the Taiwan Class Action. Three days later, Thomson filed its original declaratory judgment complaint against its primary and umbrella insurers. The primary insurers included XL, which provided insurance to Thomson from January 2000 to January 2006; Century, which provided insurance to Thomson from January 1991 to January 1995; and Zurich American Insurance Company and American Guarantee and Liability Insurance Company (collectively, "Zurich"). The umbrella insurers included XL and Travelers.

---

[4] *See* Thomson's AO App. at 930-31 (translation of Taiwan Class Action plaintiffs' additional claim: "Under the doctrine of piercing the corporate veil in Anglo-American law, it is considered unfair or unjust to grant immunity to the shareholders of a corporation, who are basically not held liable for the debts or liabilities of the corporation, because the shareholder may attempt to make use of the company to evade their liabilities, and thus the shareholders and the company are held jointly liable.… The Anglo-American doctrine may serve as the jurisprudence in judging cases, to which Taiwan law does not contain applicable provisions.… Thomson SA, Thomson Inc., and [TCEB] are the controlling companies of a subsidiary, i.e., TCETVT. They directly or indirectly caused the subsidiary to conduct business in a manner that defies normal business practice or that is not gainful. Pursuant to Article 1 of the Civil Code, the doctrine of piercing the corporate veil, and Paragraph 2, Article 369-4 of the Company Act …, the three companies should compensate the plaintiff for its injuries resulting from the acts of TCETVT. Moreover, pursuant to Paragraph 2, Article 369-4 of the Company Act …, the three companies should be jointly liable for compensation for the damage sustained by the plaintiff.").

9

In January 2009, Thomson filed an amended complaint. Zurich denied coverage in March 2009; Century denied coverage in April 2009; and XL reserved its rights in May 2009 but has provided no coverage. In August 2009, Thomson filed a second amended complaint.

In November 2009, Thomson filed a motion for summary judgment as to the primary insurers' duty to defend, which the trial court granted in its interlocutory Duty to Defend order in July 2010. Among other things, the trial court ruled that Indiana law applies to this case and that XL, Century, and Zurich have a duty to defend Thomson in the Taiwan Class Action and reimburse Thomson for reasonable and necessary defense costs, which would be determined later. In August 2010, Zurich filed a motion to certify the Duty to Defend Order for discretionary interlocutory appeal pursuant to Indiana Appellate Rule 14(B). XL and Century joined the motion, and Thomson opposed the motion, which the trial court denied in October 2010. In September 2011, Thomson filed a motion to certify the Duty to Defend Order as a final judgment pursuant to Trial Rule 54(B) and Trial Rule 56(C), which the trial court denied.

In October 2010, Thomson filed a motion for summary judgment as to trigger, allocation, occurrence and the absence of aggregates in the primary insurance policies at issue. Century filed a cross-motion for summary judgment on the number of occurrences and allocation, and Zurich and XL filed a motion for partial summary judgment concerning Thomson's obligation to pay self-insured retentions. Zurich settled with Thomson and was dismissed from the case in July 2011. In August 2011, the trial court issued the Allocation Order, which granted partial summary judgment in favor of Thomson on certain issues, and

10

certified the order as a partial final judgment pursuant to Indiana Trial Rule 56(C). Thomson, XL, and Century each filed a notice of appeal from the Allocation Order.[5]

In December 2011, XL and Century filed a motion to dismiss the appeal from the Allocation Order, which essentially challenged the propriety of the trial court's certification of the order as a partial final judgment based on the interlocutory status of the Duty to Defend Order. Thomson and Century each filed a motion for oral argument. XL objected to Thomson's motion except as to the motion to dismiss. Oral argument was scheduled solely on that issue and held on November 1, 2012. One week later, we issued an order summarily denying the motion to dismiss.

In October 2011, Thomson filed a motion for summary judgment for defense costs against XL. Thomson also sought declaratory relief as to defense costs coverage under Travelers' umbrella policies. In March 2012, Thomson filed a motion to amend its complaint to add TCETVT as a plaintiff, which XL and Travelers opposed. In June 2012, the trial court granted Thomson's motion to amend. Also in June 2012, the trial court issued the Defense Cost Orders, from which XL and Travelers appealed.

In October 2012, Thomson filed a motion to consolidate the appeals from the Allocation Order and the Defense Costs Orders, which we granted in December 2012. In its briefs regarding its Defense Costs Order, XL requested to stay the proceedings until the trial court ruled on several pending summary judgment motions; we granted that request in May

---

[5] In the Allocation Order, the trial court ruled that the Century policies do not have aggregate limits. Thomson spends several pages of its reply brief rebutting a nonexistent challenge to that ruling. Thomson's AO Reply Br. at 5-8.

2013. That same month, Travelers filed a motion for oral argument. In September 2013, the parties reported that the trial court had ruled on the aforementioned summary judgment motions and submitted a copy of that ruling. In October 2013, we issued an order granting Travelers' motion for oral argument on the issues already briefed by the parties. We held oral argument in February 2014. In May 2014, Thomson notified us that it had reached a full settlement on all issues with Travelers and had reached a partial settlement with Century regarding Century's liability for defending Thomson in the Taiwan Class Action. Travelers' appeal was dismissed, and Century's appeal remained pending as to all indemnity issues.

**Discussion**

**Section 1 – XL's Request to Dismiss This Appeal**

We first address XL's request to dismiss this appeal. XL argues,

[I]f the trial court makes any ruling on the eight (8) pending summary judgment motions regarding coverage, subsequently revises the Duty to Defend Order or this Court reverses the Duty to Defend Order on appeal following final judgment or proper certification, then any decision based on that Duty to Defend Order (including the Allocation Order and the Defense Costs Order) will, in Thomson's own words, "be built on sand,["] and "all of the briefing by the parties, and the Court's time in deciding the issue will have been wasted to a significant degree." Due to the existing uncertainties of the matters pending before the trial court, which could affect the propriety of any appellate decision, the matter is not reviewable at this time and should be dismissed without prejudice or stayed.

Furthermore, the Trial Court erroneously concluded in its … Duty to Defend Order that XL owed Thomson a duty to defend the Taiwan Class Action, even though Thomson never appeared or otherwise asserted a defense in that action. The Trial Court's Order was directed to Thomson – TCETVT was not a party at the time – and is a non-final interlocutory order which can be revised. There are multiple motions for summary judgment pending, which could require the Court to vacate or modify the Duty to Defend Order. The determination of these motions by the trial court also could affect the present

12

appeal. Therefore, no appellate ruling should be made until the pending motions are decided.

XL's XO Br. at 5-6 (citations to appendices omitted).

As it turned out, the trial court did not vacate or modify the Duty to Defend Order in ruling on the pending summary judgment motions, and XL cites no authority for the proposition that an insurer's duty to defend is contingent upon the insured's entering an appearance in an action. We agree with Thomson that "[b]y making the determination of the amount of defense costs final, the trial court logically and necessarily made the final determination that XL owed a duty to defend." Thomson's XO Br. at 24. Therefore, we deny XL's request to dismiss this appeal.[6]

### Section 2 – Applicability of XL Policy Exclusions and Defenses

From this point forward, we will be dealing primarily with the parties' appeals from the trial court's rulings on motions and cross-motions for summary judgment. "The purpose of summary judgment is to terminate litigation about which there can be no material factual dispute and which can be resolved as a matter of law." *Nationwide Ins. Co. v. Heck*, 873 N.E.2d 190, 196 (Ind. Ct. App. 2007). When reviewing a summary judgment ruling, our

---

[6] XL also argues that we should reverse the Duty to Defend Order because

Thomson bore the burden of demonstrating coverage under the XL Policies. This included the burden of proving an 'occurrence' resulting in 'bodily injury' during the policy period that was neither expected nor intended. [TCETVT], to the extent it seeks insured status, also bore this burden. The burden was not satisfied ….

XL's XO Br. at 6 (citations omitted). This argument is waived. *See Gasser Chair Co. v. Nordengreen*, 991 N.E.2d 122, 126 (Ind. Ct. App. 2013) ("Bald assertions made in an appellate brief are not to be considered in determining whether there is a genuine issue of fact, and on review, we will not search the record to find a basis for a party's argument.") (citation omitted).

standard of review is the same as that of the trial court. *Dreaded, Inc. v. St. Paul Guardian Ins. Co.*, 904 N.E.2d 1267, 1269 (Ind. 2009).

> Considering only those facts that the parties designated to the trial court, we must determine whether there is a "genuine issue as to any material fact" and whether "the moving party is entitled to a judgment as a matter of law." Ind. Trial Rule 56(C). In answering these questions, the reviewing court construes all factual inferences in the non-moving party's favor and resolves all doubts as to the existence of a material issue against the moving party. The moving party bears the burden of making a prima facie showing that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law; and once the movant satisfies the burden, the burden then shifts to the non-moving party to designate and produce evidence of facts showing the existence of a genuine issue of material fact.

*Id*. at 1269-70 (some citations omitted). "[T]he fact that cross-motions for summary judgment were made does not alter our standard of review. Instead, the reviewing court must consider each motion separately to determine whether the moving party is entitled to judgment as a matter of law." *Hammerstone v. Indiana Ins. Co.*, 986 N.E.2d 841, 845 (Ind. Ct. App. 2013) (citation and quotation marks omitted).

"Interpretation of an insurance policy presents a question of law that is particularly suitable for summary judgment." *State Auto Mut. Ins. Co. v. Flexdar, Inc.*, 964 N.E.2d 845, 848 (Ind. 2012). "Clear and unambiguous language in insurance policy contracts, like other contracts, should be given its plain and ordinary meaning." *Cinergy Corp. v. Associated Elec. & Gas Ins. Servs., Ltd.*, 865 N.E.2d 571, 574 (Ind. 2007). "Policy terms are interpreted from the perspective of an ordinary policyholder of average intelligence. If reasonably intelligent persons may honestly differ as to the meaning of the policy language, the policy is ambiguous." *Gasser v. Downing*, 967 N.E.2d 1085, 1087 (Ind. Ct. App. 2012) (citation

14

omitted). "However, an ambiguity does not exist merely because the parties proffer differing interpretations of the policy language." *Buckeye State Mut. Ins. Co. v. Carfield*, 914 N.E.2d 315, 318 (Ind. Ct. App. 2009), *trans. denied* (2010). Also, "a term is not ambiguous simply because it is not defined." *Bastin v. First Ind. Bank*, 694 N.E.2d 740, 746 (Ind. Ct. App. 1998), *trans. denied*.

A split of judicial authority on the meaning of similar contract terms does not necessarily mean that those terms are ambiguous. *Allgood v. Meridian Sec. Ins. Co.*, 836 N.E.2d 243, 248 (Ind. 2005).

> A disagreement among courts as to the meaning of a particular contractual provision is evidence that an ambiguity may exist. But a division of authority is only evidence of ambiguity. It does not establish conclusively that a particular clause is ambiguous, and we are not obliged to agree that those courts that have reached different results have read the policy correctly.

*Id*. (citation omitted).

Where an ambiguity does exist, insurance policies are to be construed strictly against the insurer. *Flexdar*, 964 N.E.2d at 848.

> This is especially true where the language in question purports to exclude coverage. Insurers are free to limit the coverage of their policies, but such limitations must be clearly expressed to be enforceable. Where provisions limiting coverage are not clearly and plainly expressed, the policy will be construed most favorably to the insured, to further the policy's basic purpose of indemnity. Where ambiguity exists not because of extrinsic facts but by reason of the language used, the ambiguous terms will be construed in favor of the insured for purposes of summary judgment.

*Id*. (citations and quotation marks omitted); *see also Am. Econ. Ins. Co. v. Liggett*, 426 N.E.2d 136, 144 (Ind. Ct. App. 1981) ("Under Indiana law, insurance policies must be construed so as to effectuate indemnification to the insured or the beneficiary. Where any

15

reasonable construction can be placed on a policy that will prevent the defeat of the insured's indemnification for a loss covered by general language, that construction will be given.").

"We construe the policy as a whole and consider all of the provisions of the contract and not just the individual words, phrases or paragraphs." *Nat'l Mut. Ins. Co. v. Curtis*, 867 N.E.2d 631, 634 (Ind. Ct. App. 2007). "We must accept an interpretation of the contract language that harmonizes the provisions, rather than one that supports conflicting versions of the provisions." *Id*. We "should construe the language of a contract so as not to render any words, phrases, or terms ineffective or meaningless." *Hammerstone*, 986 N.E.2d at 846. "[T]he power to interpret contracts does not extend to changing their terms and we will not give insurance policies an unreasonable construction to provide additional coverage." *Curtis*, 867 N.E.2d at 634.

A trial court's summary judgment ruling is clothed with a presumption of validity, and the losing party has the burden of establishing that the trial court erred. *Hammerstone*, 986 N.E.2d at 845. "Where a trial court enters specific findings and conclusions, they offer insight into the rationale for the trial court's judgment and facilitate appellate review, but are not binding upon this court. We will affirm upon any theory or basis supported by the designated materials." *Id*. (citation omitted).

\*   \*   \*

XL contends that the trial court

erred in issuing the Duty to Defend Order for several reasons, including: (1) the employer's liability exclusion in the XL Policies defeated coverage; (2) the late notice of the claims defeated coverage; (3) the "Deemer Clause" in the 2002-2005 XL Policies precluded coverage; (4) [t]he "Known Loss Doctrine"

16

precluded coverage; and (5) the coverage territory of the 2005 XL Policy precluded coverage.

XL's XO Br. at 6-7.[7]  An insurer bears the burden of proof as to any basis for avoiding coverage.  *PSI Energy, Inc. v. Home Ins. Co.*, 801 N.E.2d 705, 725 (Ind. Ct. App. 2004), *trans. denied*; *Gen. Housewares Corp. v. Nat'l Surety Corp.*, 741 N.E.2d 408, 414 (Ind. Ct. App. 2000).  With this in mind, we address each exclusion in turn.

### Section 2.1 – Employer's Liability Exclusion

XL's primary policies contain an exclusion that reads in pertinent part as follows:

**2.     Exclusions**

This insurance does not apply to:

….

e.      Employer's Liability

"Bodily injury" to:

(1)     An "employee" of the insured arising out of and in the course of:

(a)      Employment by the insured; or

---

[7] Thomson contends that XL should be estopped from raising policy defenses because it breached its duty to defend.  Thomson cites *Employers Insurance of Wausau v. Recticel Foam Corp.*, 716 N.E.2d 1015 (Ind. Ct. App. 1999), *trans. denied* (2000), for the proposition that "this Court approved the principle that an insurer is estopped from raising policy defenses to coverage when it fails to either defend under a reservation of rights or to seek a declaratory judgment that there is no coverage …."  Thomson's XO Br. at 42.  In fact, the cited portion of *Recticel Foam* states, "If an insurer fails to defend under a reservation of rights or to seek a declaratory judgment that there is no coverage *and is later found to have wrongfully denied coverage*, the insurer may be estopped from raising policy defenses to coverage."  716 N.E.2d at 1029 n.16 (emphasis added).  No such finding has been made in this case.  Moreover, as XL points out, our supreme court stated in a subsequent case that "an insurer may choose at its own peril not to defend or seek a declaratory judgment, and failure to do either is not a waiver of defenses."  *Tri-Etch, Inc. v. Cincinnati Ins. Co.*, 909 N.E.2d 997, 1001 n.2 (Ind. 2009) (citing *Microvote Corp. v. GRE Ins. Group*, 779 N.E.2d 94, 96 (Ind. Ct. App. 2002), *trans. denied* (2003)).  In sum, XL is not estopped from raising policy defenses here.

17

(b) Performing duties related to the conduct of the insured's business; or

(2) The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph (1) above.

This exclusion applies:

(1) Whether the insured may be liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

*See, e.g.*, Thomson's AO App. at 345-46.

Assuming, without deciding, that this provision excludes coverage to TCETVT for bodily injury to its employees resulting from their exposure to organic solvents in the Taoyuan plant, because the provision applies only to bodily injury arising both out of *and* in the course of employment or performing business-related duties, we cannot conclude that it applies to bodily injury resulting from exposure to organic solvents in the dormitories, where the employees bathed, drank, washed their clothes, and performed other non-work-related activities. We find XL's countervailing arguments unpersuasive. [8]

---

[8] Thomson asserts that XL has waived its arguments regarding this exclusion because XL did not raise them in opposition to Thomson's defense costs motion. We disagree. XL joined Zurich's arguments regarding this exclusion in opposition to Thomson's duty to defend motion. In its interlocutory Duty to Defend Order, the trial court addressed Zurich's arguments but said nothing about XL. XL raised the issue again in the summary judgment motions on which the trial court ruled in September 2013, and the trial court did not find it waived. We see no reason to do so here.

18

We are also unpersuaded by XL's argument that the exclusion applies to other Thomson entities because it "applies to an entity whether it is liable as an employer or in another capacity, such as alter-ego or parent of a sham corporation." XL's XO Br. at 9. The exclusion applies only to bodily injury to an employee "of the insured," and only TCETVT employed the workers in the Taoyuan plant. The phrase "liable as an employer or in any other capacity" clearly refers to multiple theories of liability as to the employer, and not to multiple entities to which the exclusion may apply. In sum, the employer's liability exclusion does not negate XL's duty to defend.

## Section 2.2 – Late Notice of Claims

In *Miller v. Dilts*, 463 N.E.2d 257 (Ind. 1984), our supreme court stated that an insurance policy's notice requirement is "'material, and of the essence of the contract.'" *Id*. at 265 (quoting *London Guar. & Accident Co. v. Siwy*, 35 Ind. App. 340, 345, 66 N.E. 481, 482 (1903), *trans. denied*); *see also Ind. Farmers Mut. Ins. Co. v. N. Vernon Drop Forge, Inc.*, 917 N.E.2d 1258, 1273 (Ind. Ct. App. 2009) ("The duty to notify an insurance company of potential liability is a condition precedent to the company's liability to its insured."), *trans. denied* (2010).

> The requirement of prompt notice gives the insurer an opportunity to make a timely and adequate investigation of all the circumstances surrounding the accident or loss. This adequate investigation is often frustrated by a delayed notice. Prejudice to the insurance company's ability to prepare an adequate defense can therefore be presumed by an unreasonable delay in notifying the company about the accident or about the filing of the lawsuit. This is not in conflict with the public policy theory that the court should seek to protect the innocent third parties from attempts by insurance companies to deny liability for some insignificant failure to notify. The injured party can establish some evidence that prejudice did not occur in the particular situation. Once such

evidence is introduced, the question becomes one for the trier of fact to determine whether any prejudice actually existed. The insurance carrier in turn can present evidence in support of its claim of prejudice. Thus, both parties are able to put forth their respective positions in the legal arena.

*Miller*, 463 N.E.2d at 265-66.

XL's primary policies contain the following notice requirement:

**2.      Duties in The Event Of Occurrence, Offense, Claim or Suit**

a.      You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

(1)      How, when and where the "occurrence" or offense took place;

(2)      The names and addresses of any injured persons and witnesses; and

(3)      The nature and location of any injury or damage arising out of the "occurrence" or offense.

b.      If a claim is made or "suit" is brought against any insured, you must:

(1)      Immediately record the specifics of the claim or "suit" and the date received; and

(2)      Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

*See, e.g.*, Thomson's AO App. at 353.

XL notes that the Taoyuan plant was closed in 1992 and that "Thomson/TCETVT had been aware of environmental contamination at the plant since at least 1989, and of allegations of bodily injury [by] former workers since 1994." XL's XO Br. at 14. XL further

20

observes that the Taoyuan plant was demolished in 2004 or 2005 and that approximately two dozen workers died between 1992 and 2008. XL contends,

> While there is no shortage of dates that XL can, and has, pointed to when Thomson/TCETVT had knowledge that bodily injury claims were being made by former workers or when suit was brought alleging similar claims, the absolute latest of those dates was April 22, 2004 when the former workers' association filed the current incarnation of the Class Action against TCETVT. Because the notice obligation under Paragraph 2.b. is triggered by suit against *any* insured, the filing of the Class Action complaint on that date activated the notice obligation for each of the Thomson Entities, not just TCETVT.

*Id*. at 11-12.[9] Thus, XL argues,

> Thomson's notice to XL on July 8, 2008 was unreasonable as a matter of law; TCETVT's notice on October 5, 2011 was even more so. The delayed notice creates a presumption of prejudice to XL which Thomson/TCETVT failed to rebut with undisputed evidence. Even if Thomson/TCETVT were able to shift the burden to XL to show prejudice, the designated evidence shows at least that genuine issues of material fact exist precluding summary judgment.

*Id*. at 10.

We disagree. Claims for damages by 3000 Taoyuan plant workers were rejected by Taiwan's Council for Labor Affairs in 1998, two years before XL sold its first policy to Thomson. The Taiwan Class Action was dismissed in 2005 and not reinstated until 2006, after XL sold its last policy to Thomson. The plaintiffs did not seek to add Thomson, Thomson SA, and TCEB as defendants until 2007. XL does not dispute Thomson's assertion that the Thomson entities have mounted a "vigorous" defense in the Taiwan Class Action,

---

[9] XL emphasizes that it "does not concede that TCETVT is an insured. However, to the extent that Thomson seeks that benefit, they also must accept the obligation of providing notice under the XL Policies." XL's XO Br. at 12 n.5.

21

including hiring experts and conducting an investigation;[10] that the first evidentiary hearing in the Taiwan Class Action was held in November 2009, more than fifteen months after notice was given in July 2008; and that the Taiwan court "still has made no substantive rulings," adverse or otherwise. Thomson's XO Br. at 44. Based on the foregoing, we conclude as a matter of law that XL has failed to establish that notice was unreasonably delayed or that it was actually prejudiced thereby.

## Section 2.3 – "Deemer Clause"

The XL primary policies from 2002 through 2005 provide in pertinent part that the insurance applies to "bodily injury" only if the "bodily injury" occurs during the policy period and,

> [p]rior to the policy period, no insured listed in Paragraph 1. of Section II – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" … had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" … occurred, then any continuation, change or resumption of such "bodily injury" … during or after the policy period will be deemed to have been known prior to the policy period.

---

[10] XL asserts,

> Timely notice affords an insurer the opportunity to protect its own rights and interests as well as those of its insured. While those interests often align – e.g., minimizing liability and damages to a third-party with claims against the insured – they often do not. An insurer's investigation enables it to protect itself against fraud, to estimate its potential risks and liabilities, to manage costs in the defense of its insured, and to evaluate its indemnity obligations to the insured for claims alleged against it. Thus, the investigation and efforts of Thomson/TCETVT's defense counsel in the Class Action is not a substitute for XL's right to conduct its own investigation.

XL's XO Br. at 14. Notably, XL has failed to establish that its interests do not align with those of the Thomson entities, which have had to pay for and manage their own defense with no promise of reimbursement. Consequently, as we discuss in more detail below, the Thomson entities have had every incentive to minimize their liability, damages, and defense costs.

*See, e.g.*, Thomson's AO App. at 466.  The policies further provide as follows:

> d. "Bodily injury" … will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1. of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:
>
> > (1) Reports all, or any part, of the "bodily injury" … to us or any other insurer;
> >
> > (2) Receives a written or verbal demand or claim for damages because of the "bodily injury" …; or
> >
> > (3) Becomes aware by any other means that "bodily injury" … has occurred or has begun to occur.

*Id.*

XL argues, "While similar to the common law known loss doctrine, this policy language referred to as the 'Deemer Clause' is independent of it and is a valid and enforceable limitation on coverage according to the terms stated in the policy."  XL's XO Br. at 15.  XL further argues,

> Thomson and TCETVT were deemed to have known of the "bodily injury" well before any policy was issued by XL to Thomson.  Accordingly, the unambiguous language of the XL Policies beginning in 2002 applies, and coverage is barred under the 2002-2005 XL Policies.  The Trial Court's Duty to Defend Order and the subsequent Defense Costs Order cannot be upheld.

*Id.* at 16.

Assuming, without deciding, that the deemer clause would bar coverage under the post-2001 XL policies, the clause does not appear in the earlier policies and thus would not negate XL's duty to defend.

## Section 2.4 – "Known Loss" Doctrine

Next, XL contends that coverage is precluded under all of its policies pursuant to the common law "known loss" doctrine. "The 'known loss' doctrine is a common law concept deriving from the fundamental requirement in insurance law that the loss be fortuitous. Simply put, the known loss doctrine states that one may not obtain insurance for a loss that has already taken place." *Gen. Housewares Corp.*, 741 N.E.2d at 413. "[T]he known loss doctrine is not so much an exception, limitation, or exclusion as it is a principle intrinsic to the very concept of insurance." *Id*. at 415. "[I]f an insured has actual knowledge that a loss has occurred, is occurring, or is substantially certain to occur on or before the effective date of the policy, the known loss doctrine will bar coverage." *Id*. at 414. Whether an insured had actual knowledge is ordinarily a question of fact. *Id*. at 413-14. "[W]hen determining a party's actual knowledge, courts should keep in mind that a party may not intentionally turn a blind eye in order to avoid application of the known loss doctrine." *Id*. at 413 n.3. "[B]ecause the effect of the known loss doctrine is to avoid coverage, the burden of proving that the loss was known is on the party seeking to avoid coverage." *Id*. at 414.

"[T]here is a distinct difference between knowledge of the existence of liability and knowledge of the full extent of liability." *Id*. at 416.

> The existence of liability can be known without the full extent of liability being fixed. For example, if one negligently injures a pedestrian with one's automobile, one's liability is substantially certain. However, it may be months before the dollar amount of liability is certain, and the known loss doctrine bars purchasing insurance after the accident. An insured's liability need not be fixed to a monetary certainty; if the known liability has occurred or is substantially certain to occur, the known loss doctrine bars coverage.

*Id*. at 417.

XL argues,

>       Here, the bodily injury claims alleged in the [Taiwan] Class Action were a "known loss" prior to inception of the first XL Policies on January 1, 2000. Beginning with discovery of the contamination in 1989 up until the inception of the first XL Policies on January 1, 2000, the very same bodily injury claims were a gathering storm that neither Thomson nor TCETVT can deny having actual knowledge of as of January 1, 2000. Indeed, as the Trial Court previously found, Thomson has known of the environmental contamination and allegations of bodily injury claims related to the site since 1989. Thus, as of 1989, eleven years prior to the effective date of the first XL Policies, Thomson/TCETVT knew of soil and groundwater contamination at the Taoyuan facility, accepted responsibility for the assessment and remediation of that contamination, and appreciated the health risks to former workers and local residents as a result of their exposure to those contaminants.

>       ….

>       Assuming, *arguendo*, that Thomson's and/or TCETVT's liability for the bodily injuries alleged in the [Taiwan] Class Action was uncertain when Thomson applied for insurance from XL, the impending legal action by the former workers' association, and the need for a defense, was no longer a "risk" – it was a certainty. By that date, the contamination alleged to have occurred at the site had taken place, the claimants, whether they had manifested or been diagnosed with illness or not, had long ago been exposed to the conditions which they allege as the cause, while other claimants had already manifested injury and sought to hold Thomson and TCETVT responsible. Thus, with respect to the bodily injury claims asserted by the claimants in the [Taiwan] Class Action, the insurance transaction through which Thomson purchased coverage from XL beginning on January 1, 2000 lacked the key and necessary feature of insurance – a transfer of risk. The act, event, or occurrence – whether it be the discharge of contaminants into the groundwater or soil at the facility, the underlying claimant[s'] exposure to industrial solvents and/or the contaminated groundwater, or even the assertion of claims by former workers seeking compensation for bodily injury – indisputably took place with Thomson's and TCETVT's actual knowledge prior to the inception of the XL Policies. As such, no coverage is available under any of the XL Policies.

XL's XO Br. at 19-20 (citations omitted).

We disagree. The "loss" at issue here is liability for bodily injury to the plant employees, not bodily injury per se or environmental contamination. *See Gen. Housewares Corp.*, 741 N.E.2d at 716 ("Because Housewares insured against liability to a third party and not property damage, we look to see if the insured knew of a liability, rather than whether property damage was known."). The Taoyuan plant was in operation for approximately twenty-two years and was owned by TCETVT for only five. The claims brought by the plant employees in the 1990s were rejected in 1998 by the Council for Labor Affairs, which published studies concluding that there was no reliable scientific proof that working at the plant would lead to illnesses. The Taiwan Class Action plaintiffs did not file suit against TCETVT until 2004. The suit was dismissed in 2005 and reinstated in 2006, and the plaintiffs did not attempt to sue the other Thomson entities until 2007. Based on his research on behalf of the Thomson entities, attorney J. Chad Mitchell believes that TCETVT did not use TCE or PCE at the Taoyuan plant "from at least 1987 until the plant closed in 1992." Thomson's AO App. at 913. Based on the foregoing, we conclude as a matter of law that the Thomson entities did not have actual knowledge that a loss occurred, was occurring, or was substantially certain to occur before the effective date of XL's policies. Even assuming for argument's sake that the Thomson entities acquired such knowledge when TCETVT was sued in 2004, this would not negate XL's duty to defend.

### Section 2.5 – Coverage Territory Exclusion

XL states that its 2005 policy

> only provides coverage for bodily injury caused by an occurrence that takes place in the "coverage territory." The bodily injuries alleged by the claimants

26

in the [Taiwan] Class Action occurred solely in Taiwan, which is not within the coverage territory of the 2005 XL Primary Policy. As a result, no coverage is available under the 2005 XL Primary Policy for the bodily injury claims asserted in the [Taiwan] Class Action.

XL's XO Br. at 21. *See* Thomson's AO App. at 678 (providing that insurance applies to "bodily injury" only if it "is caused by an 'occurrence' that takes place in the 'coverage territory'"); *id.* at 690 (defining "coverage territory" in pertinent part to restrict coverage to injury or damage arising out of goods or products made or sold by the insured in the United States, Puerto Rico, and Canada).

Thomson points out that XL failed to raise this argument below, and therefore it has waived this claim. *See Troxel v. Troxel*, 737 N.E.2d 745, 752 (Ind. 2000) (stating that a party may not raise an issue for the first time on appeal). Moreover, because the exclusion applies only to XL's 2005 policy, it does not negate XL's duty to defend.

### Section 3 – Number of Occurrences in XL and Century Policies

In the Allocation Order, the trial court ruled on the occurrences issue as follows:

> Thomson asserts that each individual claim, brought by individual claimants, constitutes a separate occurrence because each claimant's exposure to TCE/PCE was distinct. Thomson asserts that exposure took place over different lengths of time and at different locations (in the workplace and in the workers' living quarters). Thomson also asserts that each claimant may have been exposed to TCE/PCE in different ways whether by dermal contact (in the workplace or showering with TCE/PCE-contaminated water), inhalation of vapors/fumes, or ingestion (drinking TCE/PCE-contaminated water). Defendant insurers argue the workers' exposure to TCE/PCE was repeated and continuous exposure to substantially the same general harmful conditions and, therefore, constitutes a single occurrence under the Policies' terms.

> Ample case law advances both parties' arguments. After review of the factual record, this Court finds that each individual claim does not constitute a single occurrence nor do all claims constitute a single occurrence. For reasons

27

outlined below, the claimants' "bodily injury" resulted from two "occurrences" under the terms of the Policies. The first occurrence is exposure and resulting injury due to deficient workplace conditions (insufficient gas ventilation equipment and monitoring, failure to warn of potential harm and proper emergency measures, failure to appoint doctors, failure to give proper protective equipment). The second occurrence is exposure and resulting injury due to illegal dumping of chemicals (TCE/PCE and VOCs [volatile organic compounds]) that tainted the local water supply workers used for drinking and bathing in the workers' dormitories (their residence).

The pertinent provisions of the 1994 - 2006 Defendant insurers' policies are as follows:

> This insurance applies to "bodily injury" and "property damage" only if:
> (1) The "bodily injury" … *is caused by an "occurrence"* that takes place in the "coverage territory".
> (2)     The "bodily injury" … *occurs during the policy period.*

"Bodily injury" is defined by the policies as:

> … bodily *injury, sickness,* or *disease* sustained by a person, including *death* resulting from any of these at any time.

"Occurrence" is defined by the policies as:

> … an accident, including *continuous or repeated exposure to substantially the same general harmful conditions.*

The terms of the Policies as well as the factual circumstances show that a single occurrence construction, rather than multiple occurrences, is proper. First, the "continuous or repeated exposure to substantially the same general harmful conditions" policy language in this case is not present in many of the cases cited by Thomson where multiple occurrences were found. In many of those cases the policy language was broader than here. While some cases contain the same (or similar) restrictive policy language found here, other factual circumstances (various geographical locations, time periods, multiple proximate causes of injury, etc.) predominate the courts' analyses rather than merely the policy language; generally the policies were viewed as ambiguous in these cases.

Second, many of the multiple occurrence cases involved the manufacture and sale of defective goods which injured third parties as opposed to workers. The controversies in multiple occurrence cases primarily centered on the shipment of defective goods to buyers, not poor workplace conditions or illegal dumping of chemicals as here. With the latter, courts determine the "occurrence" by evaluating the cause or causes of the resulting injury and, using the "cause" theory, the courts ask if "there was but one proximate, uninterrupted, and continuing cause which resulted in all of the injuries and damage." Although no Indiana Appellate Court has examined this issue, two Indiana federal courts, *Irving Materials, Inc. v. Zurich American Ins. Co.*, 2007 WL 1035098 (S.D. Ind., March 30, 2007) and *Indiana Gas Co., Inc. v. Aetna Cas. & Sur. Co.*, 951 F. Supp. 773 (1996), vacated *Indiana Gas Co., Inc. v. Home Ins. Co.*, 141 F.3d 314 (7th Cir. 1998), have specifically examined the issue of number of occurrences in the context of continuing injury or damage. The Court finds these cases persuasive and notes that where "there is scant Indiana law on [an] issue … [Indiana courts] turn for guidance to the federal courts …" *Tony v. Elkhart County*, 918 N.E.2d 363, 369 (Ind. Ct. App. 2009). Both courts have applied the "cause" test and have refused to tie the number of occurrences to the number of claimants. Here, the alleged hazardous workplace conditions and the alleged illegal chemical dumping (into the local water stream) are each shown by the evidence presented as capable of being "one proximate, uninterrupted, and continuing cause which resulted in all of the injuries and damage," each its own occurrence.

Third, the third parties in multiple occurrence cases suffered injuries at various geographical locations, and this is not the case here. The Taiwanese workers were injured solely on the Taoyuan plant property in the manufacturing buildings or the dormitories. Here, there are two separate conditions and each of them on their own could be considered "continuous or repeated exposure to substantially the same conditions" even though they occurred within the same geographical location. The first is exposure and resulting injury due to deficient workplace conditions and the second is exposure and resulting injury due to illegal dumping of chemicals tainting the local water supply.

This Court finds that this case involves two (2) separate occurrences under the "cause" theory: 1) deficient workplace conditions and procedures and 2) illegal dumping of hazardous chemicals which tainted the local water supply. Each of these occurrences is factually distinct. Even though hazardous chemical (TCE/PCE and VOCs) exposure is the underlying cause of injury the promulgation of conditions and practices which allowed for

hazardous workplace conditions are different than those which led to exposure in the workers' residence.

Thomson's AO App. at 44-48.

Thomson disagrees with the trial court's finding of only two occurrences, arguing that

[e]ach worker worked at the Taoyuan plant at different times, was allegedly exposed in unique ways, and has a unique set of injuries allegedly caused by the exposures. All the applicable policies provide coverage for an "occurrence" which is defined as "*an accident*, including continuous or repeated exposure to substantially the same general harmful conditions." The applicable primary policies define "bodily injury" to mean "bodily injury, sickness, or disease sustained *by a person*, including death resulting from [any of] these at any time." (emphasis supplied). Thus, all applicable primary policies provide coverage in their insuring clauses to cover "bodily injury," which is defined to be sustained by a single person. And all the applicable policies define "occurrence" to be a single "accident."… [E]ach plaintiff member alleges repeated exposure at the Taoyuan plant, which over time resulted in each plaintiff's injuries with each injury causing event a single distinct accident. Thus, each plaintiff Association member alleges a separate occurrence.

Absent from the [Century] and XL primary policies are any "deemer" clauses that make "all damages that arise from exposure to the same general conditions are considered to arise out of one 'occurrence.'" This missing language is present in the policies in virtually every case the insurers cited to the trial court. If the insurers had wanted to limit its [sic] coverage in this way, they should have done so by using this language. The absence of this language in the primary policies indicates that "all damages" are *not* to be grouped together to constitute a single occurrence.

Thomson's AO Br. at 24-25. Thomson also contends that the trial court "incorrectly looked to federal cases to adopt a common 'cause' test for determination of the number of occurrences," given that Indiana state appellate courts have not done so. *Id*. at 34.

30

In response, Century and XL first emphasize the following language from their policies, much of which was not quoted in the Allocation Order:[11]

**COVERAGE A.  BODILY INJURY AND PROPERTY DAMAGE LIABILITY INSURING AGREEMENT**

We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" … to which this insurance applies.… This insurance applies only to "bodily injury" … which occurs during the Policy Period.  The "bodily injury" … must be caused by an "occurrence."…

1.      The amount we will pay for damages is limited as described in SECTION III – LIMITS OF INSURANCE;

….

**SECTION III – LIMITS OF INSURANCE**

The Limits of Insurance for COMMERCIAL GENERAL LIABILITY COVERAGE shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

1.      Insureds;

2.      Claims made or "suits" brought; or

3.      Persons or organizations making claims or bringing "suits."

The Each Occurrence Limit is the most we will pay for the sum of

1.      Medical expenses under Coverage C; and

2.      Damages under Coverage A because of all "bodily injury" and "property damage" arising out of any one "occurrence";

….

---

[11]  XL adopts Century's argument by reference pursuant to Indiana Appellate Rule 46(G).  The relevant language of XL's policies does not differ substantially from that of Century's policies for purposes of this issue.

**SECTION V – DEFINITIONS**

….

**Bodily injury**

means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

….

**Occurrence**

means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

….

LIABILITY COVERAGES DECLARATIONS

….

COMMERCIAL GENERAL LIABILITY COVERAGE

| | |
|---|---|
| $1,000,000 | each "occurrence" |
| $1,000,000 | products completed/operations aggregate |
| $1,000,000 | personal & advertising injury aggregate |
| $1,000,000 | premises damage limit (each "occurrence") |
| $10,000 | medical expense limit (any one person) |

Thomson's AO App. at 71, 79, 83, 87, 58.

Century and XL contend,

The mere fact that workers may have suffered exposure in different ways or different times … does not mean there are multiple occurrences. To the contrary, the "occurrence" definition expressly contemplates such a scenario by providing that "continuous or repeated exposure to **substantially** the same **general** harmful conditions" -- not identical exposure to identical conditions -- constitutes a single occurrence.

Century's AO Br. at 9. They further assert,

32

The Declarations reflect that the policies expressly contemplate a distinction between "per occurrence" limits and "per person" limits. While Thomson ignores this distinction by suggesting that the "occurrence" limit applies on a "per person" basis, if Thomson had wanted to base bodily injury coverage on the number of claimants, it could have negotiated coverage on an "any one person" basis, just as Thomson did for medical expense coverage. Thomson chose not to do so.

*Id*. at 10.

Turning to the Allocation Order itself, Century and XL contend that "[t]he trial court correctly applied a 'cause' test to determine the number of occurrences presented by the class action, because that test properly interprets the plain language of Century's [and XL's] policies." *Id*. at 11. They argue,

Not surprisingly, since Century's policies … afford coverage on an "occurrence" as opposed to a "claim" basis, Thomson has … advanced an overly simplistic argument to support its "one occurrence per plaintiff" approach: because the "bodily injury" definition includes injury "sustained by a person" and the insuring agreement covers bodily injury, this must mean that if a single person suffers injury it is a separate occurrence. In so doing, Thomson has deliberately confused the issue of what constitutes an "occurrence" with the separate issue that is before this Court -- how many "occurrences" are there. As courts have recognized, however, if the test for determining the number of occurrences could be answered simply by looking at the ultimate resulting injuries, as Thomson suggests, no court would ever find a single occurrence to apply in a multiple plaintiff case.

Century's AO Br. at 12 n.7. As for Thomson's arguments regarding deemer clauses,[12] Century and XL assert that their policies "contain language that is functionally equivalent" thereto, that is, they *"fix the most [Century] will pay,"* *"regardless of the number of persons*

---

[12] Century and XL contend that Thomson's deemer clause argument was raised for the first time on appeal. Century's AO Br. at 26. Thomson asserts that this argument "was a central point at the hearing on the motion for summary judgment held on June 1, 2011" and that Thomson "submitted a proposed order to the Trial Court, which distinguished [Century's] cases in this manner." Thomson's AO Reply Br. at 19-20. The record supports Thomson's assertion.

*making claims,*" and "through the 'occurrence' definition contemplate the aggregation of multiple claims into a single occurrence where there is 'continuous or repeated exposure to substantially the same general harmful conditions." *Id*. at 26 (quoting Thomson's AO App. at 71).

We agree with the trial court's finding of two occurrences based on its application of the policy language to the facts alleged by the Taiwan Class Action plaintiffs. We also find nothing wrong with the trial court's application of the cause theory, which has been adopted by a majority of jurisdictions to determine the number of occurrences in cases involving multiple injuries.[13] The Illinois Supreme Court has written a useful description of the cause theory and a competing approach, the effect theory:

> The definitions of occurrence used in the insurance policies [at issue] are typical of commercial liability policies. As in our case, such policies often describe an occurrence using terms such as "accident," "happening" or "event." While the form of such terms is singular, what seems like a single accident, happening, or event to the person who triggered the incident giving rise to the loss for which coverage is sought may be perceived as multiple accidents, happenings or events from the perspective of those who sustained injury or damage as a result of the insured's conduct. Accordingly, the terms of the insurance policy are not always sufficient, standing alone, to permit a definitive determination as to whether a particular case involves one occurrence or many.

> In order to overcome this problem, American courts have developed two basic approaches for assessing the number of occurrences that took place within the meaning of policies such as those at issue in this case, the cause theory and the effect theory. The effect theory, as its name implies, determines the number of accidents or occurrences by looking at the effect an event had, *i.e.*, how many individual claims or injuries resulted from it. Under the cause

---

[13] Although not controlling, the Indiana federal court decisions cited by the trial court have persuasive value. We note that *Indiana Gas* was vacated based on lack of diversity jurisdiction and not on substantive grounds.

theory, on the other hand, the number of occurrences is determined by referring to the cause or causes of the damages.

The difference between these two approaches is illustrated by the following hypothetical. Assume that a motorist is traveling down a street lined with parked cars. Looking away from the roadway to change the station on his car's radio, the motorist allows his vehicle to wander. As a result, his car strikes the sides of three of the parked cars in succession, damaging each of them. The owners of the three damaged vehicles sue, and the vehicle owner seeks indemnification from his automobile insurance carrier. Under the effect theory, the fact that three cars were damaged and three claims were filed would mean that there were three "occurrences" for purposes of determining liability coverage, absent specific policy language to the contrary.[14] Under the cause theory, on the other hand, the fact that the damage to all three vehicles resulted from the same conditions and was inflicted as part of an unbroken and uninterrupted continuum would yield the conclusion that there was only one occurrence. Neither the cause theory nor the effect theory inevitably favors one party to an insurance contract over another. Whether a particular approach would be more beneficial to the insurance carrier or its insured depends on the limits of coverage, the number of claims, the magnitude of the claimant's losses, and the size of applicable deductibles in a given case. For example, attributing damages sustained by multiple claimants to multiple occurrences would be beneficial to the insured where the claims are large relative to the per-occurrence policy limits, for it would maximize the coverage the insured will receive. It would benefit the insurance carrier where, as in this case, the individual claims are each smaller than the applicable deductible, for it would allow the insurer to avoid paying anything. The full loss would be borne by the insured.

---

[14] Century observes that "[w]hile a small minority of courts have employed an 'effect' test, which bases the number of occurrences not on the underlying cause but on the resulting injuries, not even Thomson advocates the 'effect[]' test here." Century's AO Br. at 11 n.6.

35

*Nicor, Inc. v. Associated Elec. & Gas Ins. Servs. Ltd.*, 860 N.E.2d 280, 286-87 (Ill. 2006)

(citations omitted).[15]

In this case, the Taiwan Class Action plaintiffs' alleged injuries have two causes: (1) exposure to organic solvents while working in the factory (through inhalation, dermal contact, and ingestion of contaminated water); and (2) exposure to organic solvents while using contaminated groundwater in the dormitories (through drinking, bathing, and clothes washing).[16] The specific means and timing of exposure and the resulting injuries may differ

---

[15] *Nicor* involved the contamination of gas company customers' homes during the removal of gas meter regulators containing mercury. Of the 1070 homes throughout northern Illinois where contamination was discovered, 195 were subject to the policies at issue. The appellate court ruled that each mercury spill was a separate occurrence, and the supreme court affirmed, stating,

> Liability was incurred only when mercury happened to spill as an old-style regulator was being replaced with one of the new mercury-free units.… The spills had no common cause. Mercury escaped from the regulators under a variety of circumstances, including unique physical circumstances in particular homes which required technicians to tilt gas meters in order to remove them. One spill was reported to have resulted when the Nicor technician accidently stumbled or tripped. Sometimes technicians were careless and neglected to follow Nicor's safe mercury-handling procedures. In addition, the spills occurred at different times over a 17-year period in the case of the spills subject to the London Insurers' policies. No temporal or geographical pattern to these spills was established, and no claim was made that any particular technician or group of technicians was responsible for the spills. The technicians did not even share a common employer. Some were apparently Nicor employees while others worked for the company's subcontractors. To say that each of the 195 spills emanated from a single cause would, under these circumstances, be completely untenable.

860 N.E.2d at 295. Thomson cites *Nicor* in support of its argument for multiple occurrences, but because of the numerous factual distinctions we do not find it persuasive. We are also unpersuaded by Thomson's reliance on *Plastics Engineering Co. v. Liberty Mutual Insurance Co.*, 759 N.W.2d 613 (Wis. 2009), where multiple occurrences were found based in part on the individual plaintiffs' exposure over several decades to the defendant's asbestos-containing products, which had been sold at numerous places across the country. Here, TCETVT owned the Taoyuan plant for only five years, and the workers were exposed to organic solvents only in the factory and the dormitories.

[16] Thomson disputes the trial court's statement that the groundwater was contaminated by illegal dumping, Thomson's AO Reply Br. at 18 n.9, but the cause of contamination is irrelevant for purposes of our analysis.

with respect to each plaintiff, but it is undeniable that the alleged injuries were caused by "continuous or repeated exposure to *substantially* the same *general* harmful conditions" in the factory and in the dormitories. It is also undeniable that the policies differentiate between per-occurrence and per-person limits and that the per-occurrence limit fixes the amount that the insurer will pay for the sum of damages because of *all* bodily injury arising out of any one occurrence and regardless of the number of claims made or suits brought or the number of persons making claims or bringing suits. All of this cuts decisively against Thomson's argument that each bodily injury must be a separate occurrence and that a deemer clause is required to group multiple injuries into a single occurrence. Thus, based on the cause theory and the unambiguous language of the relevant policies, we affirm the trial court's finding of two occurrences in this case.[17]

**Section 4 – Applicability of Deductibles in XL's 2000-2002 Primary Policies**

In the Allocation Order, the trial court ruled that "Thomson must pay and satisfy the applicable SIR [sic[18]] for each occurrence for [XL's] 2000, 2001, and 2002 primary policies,

---

[17] Because we find the policy language unambiguous, we reject Thomson's invitation to construe the policies against the insurers and to find multiple occurrences to "further the purpose of fully insuring Thomson for potential liability in the Taiwan Class Action." Thomson's AO Br. at 36. Likewise, we need not consider Century's argument that finding one occurrence per plaintiff would result in a "windfall" to Thomson. Century's AO Br. at 13.

[18] In *Monroe Guaranty Insurance Co. v. Langreck*, 816 N.E.2d 485 (Ind. Ct. App. 2004), we explained,

37

before XL must pay any indemnity costs[.]" Thomson's AO App. at 49. Thomson contends

that this ruling is erroneous.

XL's 2000 primary policy contains the following "Deductible Liability Endorsement":

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE
PART

**SCHEDULE**

| Coverage | Amount and Basis of Deductible | |
| --- | --- | --- |
| | PER CLAIM or | PER OCCURRENCE |
| Bodily Injury Liability | $ | $ |
| OR | | |
| Property Damage Liability | $ | $ |
| OR | | |
| Bodily Injury Liability and/or | | |
| Property Damage Liability | | |
| Combined | $ | $500,000 Products/Completed Operations |
| | | $250,000 All Other Coverages |

….

---

There are key differences between a deductible, which generally exist in primary policies, and retained amounts, which generally are found in umbrella policies or policies designed to be excess of a self-insured amount. One difference is that while a deductible is subtracted from a policy's limits, thereby reducing an insurer's total obligation to the insured, the full limits of a policy including a retained amount are available to the insured once that amount has been satisfied. Another key difference is that in a policy with a deductible, the insurer retains complete control of claims handling; in a policy with a retained amount, the insurer has no claims handling responsibility, particularly with respect to claims not exceeding the retained amount.

*Id.* at 495 (citation omitted). The relevant endorsements of XL's 2000, 2001, and 2002 primary policies involve deductibles, and the relevant endorsements of XL's 2003, 2004, and 2005 primary policies involve self-insured retentions/SIRs.

The deductible applies to the sum of all loss arising out of "bodily injury", "property damage", and/or "Supplementary Payments - Coverage A", however caused.

A.    Our obligation under the Bodily Injury Liability and Property Damage Liability Coverages to pay damages on your behalf applies only to the amount of damages in excess of any deductible amounts stated in the Schedule above as applicable to such coverages.

B.    You may select a deductible amount on either a per claim or a per "occurrence" basis.  Your selected deductible applies to the coverage option and to the basis of the deductible indicated by the placement of the deductible amount in the Schedule above.  The deductible amount stated in the Schedule above applies as follows:

   1.    **PER CLAIM BASIS.**  If the deductible amount indicated in the Schedule above is on a per claim basis, that deductible applies as follows:

      a.    Under Bodily Injury Liability Coverage, to all damages sustained by any one person because of "bodily injury";

      b.    Under Property Damage Liability Coverage, to all damages sustained by any one person because of "property damage"; or

      c.    Under Bodily Injury Liability and/or Property Damage Liability Coverage Combined, to all damages sustained by any one person because of:

         (1)    "Bodily injury";
         (2)    "Property damage"; or
         (3)    "Bodily injury" and "property damage" combined

      as the result of any one "occurrence".

      If damages are claimed for care, loss of services or death resulting at any time from "bodily injury", a separate deductible amount will be applied to each person making a claim for such damages.

      ….

39

2. **PER OCCURRENCE BASIS.** If the deductible amount indicated in the Schedule above is on a "per occurrence" basis, that deductible amount applies as follows:

a. Under Bodily Injury Liability Coverage, to all damages because of "bodily injury";

b. Under Property Damage Liability Coverage, to all damages because of "property damage"; or

c. Under Bodily Injury Liability and/or Property Damage Liability Coverage Combined, to all damages because of:

(1) "Bodily injury';
(2) "Property damage"; or
(3) "Bodily injury" and "property damage" combined

as the result of any one "occurrence", regardless of the number of persons or organizations who sustain damages because of that "occurrence."

*Id*. at 359-60.

The endorsements in XL's 2001 and 2002 primary policies are substantially similar,

but the deductible liability endorsement schedule reads as follows:

| Coverage | Amount and Basis of Deductible PER CLAIM or PER OCCURRENCE | |
|---|---|---|
| Bodily Injury Liability | $ | $ |
| And/or | | |
| Property Damage Liability- | $ | $250,000 |
| All Other Coverages | | |
| OR | | |
| Bodily Injury Liability and/or | | |
| Property Damage Liability Combined- | | |
| Products/Completed Operations only | $ | $500,000 |

*Id*. at 410, 483.

Thomson makes the following argument:

While the trial court correctly held that Thomson chose a "Per Occurrence" instead of "Per Claim" in the deductible endorsement, it is important to examine the difference between the types of deductibles offered under the policy endorsement in effect for the [foregoing] policies. Under Indiana law, any contract provision must be read with the assumption that every word was included for a purpose. The [foregoing] policies provided the policyholder with a choice of two different deductibles. That choice must make a difference; otherwise the giving of the "choice" would have no purpose.

The "Per Claim" deductible term in XL's preprinted endorsement, not selected by Thomson, provides that as to "Bodily Injury Liability Coverage," the deductible applies "to all damages sustained **by any one person** because of [']bodily injury.[']" (emphasis added). In contrast, the deductible in the applicable "Per Occurrence" term … applies "to all damages because of 'bodily injury.'" The "Per Claim" section also provides that "if damages are claimed for care, loss of services or death resulting at any time from [']bodily injury,['] a separate deductible amount will be supplied to each person making a claim for such damages." That sentence is not present in the "Per Occurrence" deductible which is applicable to the Thomson policies. The contrast between these alternative provisions shows separate deductibles do not apply when the "Per Occurrence" selection is made as it was in Thomson's policies. Instead, "all damages because of bodily injury" are considered together to satisfy a single $250,000 deductible.

Thomson's AO Br. at 40-41 (citations omitted).

Thomson's argument ignores the last sentence of the "per occurrence" claim section, which provides that the per-occurrence deductible applies to all damages because of bodily injury "*as the result of any one 'occurrence'*, regardless of the number of persons or organizations who sustain damages because of that 'occurrence.'" The trial court properly found two occurrences and also properly found that Thomson must satisfy the deductible for each occurrence for XL's 2000, 2001, and 2002 primary policies. Therefore, we affirm on

41

this issue, subject to our holding in Section 6 of this opinion regarding the personal injury coverage in XL's 2000 primary policy.

## Section 5 – Applicability of SIRs in XL's 2003-2005 Primary Policies

XL's 2003, 2004, and 2005 primary policies contain the following "Retention Endorsement":

This endorsement modifies insurance provided under the following:

Commercial General Liability Coverage Part

It is agreed that such insurance as is afforded by this policy applies subject to the following additional provisions, which in the event of conflict with any provisions elsewhere in the policy shall control the application of the insurance to which this endorsement applies:

1.  The Limits of Insurance as stated on the declarations page shall apply excess of a retained limit of $250,000 per occurrence for Premises Operations and $500,000 per occurrence for Products/Completed Operations and you agree to assume this retained limit (herein called the "self-insured retention"). We will pay only the amount excess of the self-insured retention.

    You shall have the obligation to provide, at your own expense, adequate defense and investigation of any claim and to accept any reasonable offer of settlement within the self-insured retention and in event of your failure to comply with this clause, no loss, cost or expense shall be payable by us.

    ….

2.  This retention endorsement applies to those claims or suits that would be covered by the above referenced coverage part(s) in the absence of this endorsement.

3.  You are obligated to pay the following up to the limit of the self-insured retention:

42

a.  All compensatory amounts which an insured shall become legally obligated to pay as damages because of bodily injury, property damage, personal injury, or advertising injury sustained by one or more persons or organizations.

b.  All supplementary payments as defined in the policy and all loss adjustment expense including but not limited to the following:

All administrative agency and court costs, fees and expenses; fees for service of process; fees to attorneys; the cost, material and labor for photography; fees or costs for experts; cost of copies of transcripts of testimony at coroner inquests or criminal or civil proceedings; cost of copies of public records; cost of depositions and court reporters or recorded statements; and any similar costs or expenses properly chargeable to the investigation or defense of a particular claim or to protect the right of subrogation of the company.

….

7.  In the event of a claim or claims arising which appear likely to exceed the self-insured retention, no costs, other than loss adjusting expenses, shall be incurred by you without the prior written consent of us.

8.  We shall have the right in all cases to assume charge of the defense and/or settlement of any claim and, upon written request from us, the insured shall tender such portion of the self-insured retention as we may deem necessary to complete the settlement of such claim.

*See, e.g.*, Thomson's AO App. at 588-89.

XL contends that the trial court simply failed to address these SIRs in the Allocation

Order.  XL says,

This Court recognized the obligation of an insured to satisfy SIR's in Allianz Ins. Co. v. Guidant Corp., 884 N.E.2d 405 (Ind. Ct. App. 2008), trans. denied, 915 N.E.2d 977 (Ind. 2009).  There, the insured argued that the mere potential exhaustion of an SIR was sufficient to trigger an insurer's duty to defend.  Id. at 420.  The Court rejected the insured's argument, holding that:

Our Supreme Court recently explained that **it is only *after* the SIR is exhausted that an insurer's duty to defend, among other things, is triggered.** *Cinergy Corp. v. Assoc. Elec. & Gas Ins. Servs., Ltd.*, 865 N.E.2d 571, 576-77 (Ind. 2007); *see also Monroe Guar. Ins. Co. v. Langreck*, 816 N.E.2d 485, 495-96 (Ind. Ct. App. 2004) (holding that coverage is available to the insured once the SIR has been satisfied and that the insurer has no claims handling responsibility with respect to claims not exceeding the SIR). It is apparent, therefore, that it is the responsibility of the policyholder to prove this condition precedent to coverage—SIR exhaustion—and unless and until it is able to do so, the duty to defend is not triggered.

Id. (emphasis added).

As Allianz holds, Thomson must prove that the $250,000 SIR for each "occurrence" has been satisfied under the 2003 XL Policy, 2004 XL Policy, and 2005 XL Policy before any obligations under those Policies commence. Accordingly, the Court should reverse the trial court's failure to find that the Retention Endorsement in [those policies] applies, and remand with instructions that Thomson must prove the SIR for each "occurrence" has been satisfied before any of XL's obligations under [those policies] are triggered.

XL's AO Br. at 37-38.

We agree with XL and therefore reverse and remand with instructions to order Thomson to prove that the SIR for each "occurrence" has been satisfied before any of XL's obligations under its 2003, 2004, and 2005 primary policies are triggered.[19]

**Section 6 – Applicability of Personal Injury Provisions in XL's 2000 Primary Policy**

XL's 2000 primary policy reads in pertinent part as follows:

**COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**
**1.     Insuring Agreement**

a.     We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.…

b.     This insurance applies to "bodily injury" and "property damage" only if:

---

[19] Thomson argues,

The Trial Court did not commit any error by not addressing the SIR issue in the later XL policies ….  All of XL's arguments as to the use of SIRs to limit its primary coverage were made part of a joinder into a motion filed by another insurer, Zurich, as to Zurich's SIRs.  Zurich then settled with Thomson.  Zurich's cross motion was withdrawn and Zurich did not participate in oral argument.  XL did not renew the motion as its own.  It was therefore within the Trial Court's discretion to not further consider the cross motion on SIRs in the [aforementioned] policies.  If XL wanted declaratory relief on its later primary policies, it should have moved with a separate motion.

Thomson's AO Reply Br. at 31-32.  XL notes that, pursuant to Indiana Trial Rule 56(B), "[w]hen any party has moved for summary judgment, the court may grant summary judgment for any other party upon the issues raised by the motion although no motion for summary judgment is filed by such party."  XL asserts that it

designated the relevant provisions of the XL Policies, and adopted and incorporated by reference the arguments made by [Zurich] on this issue.  XL also requested that the trial court grant XL partial summary judgment and declare that "Thomson must prove that it has exceeded its per occurrence deductible and/or self-insured retention of $250,000 for each claimant that triggers coverage under any XL policy before XL has any duty to defend or indemnify Thomson[.]"  Thus, XL raised and is entitled to summary judgment on this issue.

XL's AO Reply Br. at 19-20 (citations to appendix omitted).  We agree with XL.

   (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory" and

   (2) The "bodily injury" or "property damage" occurs during the policy period.

 ….

## 2. Exclusions

This insurance does not apply to:

….

 o. Personal And Advertising Injury

  "Bodily injury" arising out of "personal and advertising injury."

 ….

## COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY

## 1. Insuring Agreement

 a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages.…

 b. This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

 ….

## SECTION V – DEFINITIONS

….

14.    "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

…

c.    The wrongful eviction from, wrongful entry into, or invasion of the right of occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

Thomson's AO App. at 345, 348, 349, 355, 356. On appeal, XL does not dispute Thomson's contention that its 2000 primary policy does not have a deductible for personal injury coverage.

In the Duty to Defend Order, the trial court ruled that XL's policies provide coverage for personal injury. The trial court stated that in *Travelers Indemnity Co. v. Summit Corp. of America*, 715 N.E.2d 926 (Ind. Ct. App. 1999), "the Indiana Court of Appeals held that 'personal injury' encompassed environmental liability claims." Thomson's AO App. at 1223. The trial court further stated that XL's definition of personal injury expressly includes "consequential bodily injury" and concluded,

Here, the "wrongful entry" and "invasion of the right of private occupancy" terms include alleged entry of organic solvents into the soil and groundwater around the site and into the water supplies of the workers in the dormitories. The offense continues until the injury is manifest. There could not be more clear allegations of "wrongful entry" and an "invasion of the right of private occupancy."

*Id*. at 1224.

In the Allocation Order, however, the trial court ruled that

47

coverage for the Taiwan Class Action does not concern "personal injury" coverage. Defense/indemnity costs associated with the Taiwan Class Action claimants could only fall within the 2000 policy's "Bodily Injury" coverage.

The Taiwan Class Action claimants seek redress for bodily injury, sickness and/or disease related to environmental contamination, which implicates the Coverage A for "Bodily Injury". Conversely, the Taiwanese claimants do not seek redress for false imprisonment, defamation, infringement, and the other sorts of injuries provided for by Coverage B, for "personal and advertising injury."

Therefore, the 2000 policy's personal injury coverage has no bearing on Thomson's obligation to satisfy policy deductibles related to the Taiwan Class Action claims which implicate the "Bodily Injury" coverage.

*Id*. at 48-49.

In appealing the Allocation Order, Thomson laments the trial court's "change of opinion" on this issue. Thomson's AO Br. at 38 n.8. Thomson argues that "[t]he allegations of the Taiwan Class Action include claims that the workplace chemicals wrongfully entered the premises occupied by the workers – both at the plant [and] in the dormitories. This Court previously determined in [*Summit*] that similarly worded policy language provided coverage for environmental property damage claims." *Id*. at 38-39.

In that case, Summit sought coverage for claims resulting from environmental contamination at sites in several states, including Indiana. The trial court determined, among other things, that the "personal injury" provisions in the relevant policies provided coverage for the environmental cleanup claims against Summit. On appeal, we reviewed the applicable "personal injury" provisions. Those provisions defined "personal injury" as "injury, other than bodily injury," unlike XL's provision here (which specifically defines "personal injury" as "injury, including consequential 'bodily injury'"), but they are otherwise

48

substantially similar in that they allow coverage for personal injury arising out of "[t]he wrongful eviction from, wrongful entry into or invasion of the right of private occupancy of a room, dwelling, or premises that a person occupies by or on behalf of its owner, landlord or lessor." *Summit Corp.*, 715 N.E.2d at 936-37 (emphasis removed). The *Summit* court found that the terms "wrongful," "entry," and "invasion" "can have a variety of meanings" and therefore were ambiguous and must be construed "against the insurer and in favor of coverage" for the "pollution of real property of others by Summit in sending wastes to real property of others and allowing contaminated groundwater to migrate from its sites to neighboring land." *Id*. at 937.

Thomson contends that *Summit* should control in favor of personal injury coverage in this situation, which involves the "entry of solvents into a water supply" and consequential bodily injury. Thomson's AO Br. at 39. XL argues that

> the "plain terms" of the XL Policies establish that coverage for "bodily injury" may **not** simultaneously exist under Coverage A and Coverage B.… What Thomson ignores … is that the XL Policies contain an exclusion under Coverage A for "'bodily injury' arising out of 'personal and advertising injury'." By the "plain terms" of the XL Policies, if there is "bodily injury" under Coverage B, then such "bodily injury" is excluded under Coverage A.

XL's AO Br. at 20 (citations to appendix omitted). Thomson replies that "[t]here is nothing in the policy to prevent [it] from selecting [personal injury] coverage instead of the bodily injury coverage that is subject to a $250,000 deductible." Thomson's AO Reply Br. at 30. We agree with Thomson in all respects and therefore reverse the trial court on this issue.

### Section 7 – Applicability of "Continuous Trigger" to XL Policies

In the Duty to Defend Order, the trial court ruled on the issue of trigger as follows:

49

The trigger of coverage for a bodily injury claim is controlled by *Eli Lilly & Co. v. Home Ins. Co.*, 482 N.E.2d 467 (Ind. 1985). In *Eli Lilly*, the plaintiffs in the underlying actions alleged that they had been exposed to the anti-miscarriage drug diethylstilbestrol and that the mothers and their female offspring allegedly were injured by the development of cancer years later. *Lilly*, 482 N.E.2d at 468. Lilly strongly contested the allegations. The Indiana Supreme Court held that:

> In order to achieve the objectives in Indiana law, of giving effect to the policies' dominant purpose of indemnity, *we hold that coverage is triggered at any point between ingestion of DES and the manifestation of a DES-related disease.* This holding comports with the rule of interpretation that the courts should strive to give effect to the reasonable expectations of the insured. We therefore adopt the multiple trigger interpretation of the "injury"/ "occurrence" language in Lilly's policies.

*Id*. [at 471] (emphasis supplied). Under *Lilly's* triple trigger, any policy with a policy period during initial exposure, during the period of latency, or at alleged manifestation of the disease is triggered. There is just such evidence here. XL insured Thomson from 2000, before the complaint was filed, to 2006. The 2004 complaint, filed years after XL's coverage incepted, alleges injury "until now." The plaintiffs included many persons who were presently not ill but feared cancer which may manifest in the future. The Plaintiff Association has continually added new members with new claims. Newly manifested claims are being presented each time new members are added. Of the two plaintiffs who have provided medical evidence to date, one identified cancer she claimed manifested in 2008 and 2010. There is ample evidence, in all these facts, to support the possibility of coverage in XL's 2000 through 2005 policies under the *Lilly* trigger.

Thomson's AO App. at 1214-15 (citations to affidavit omitted).

In its brief in support of its motion for summary judgment on trigger, allocation, occurrence, and the absence of aggregates, Thomson argued that

> the bodily injury claims filed against the Thomson entities in the underlying action … trigger each of the liability insurance policies that are at issue in this action … from the date each worker alleges to have been exposed to the chemicals through the date of alleged manifestation of injury, including a diagnosis of cancer allegedly connected to the exposure.

*Id*. at 1146.

In its response to Thomson's motion, XL stated,

> *[W]hile XL acknowledges that* Eli Lilly*'s triple trigger is applicable in this case*, Thomson has misread and mischaracterized the precise time at which disease manifestation occurs. In its motion, Thomson assumes without reason or citation to supportive case law, that manifestation of disease occurs when disease is diagnosed. *Eli Lilly* is silent on the issue; it held only that trigger occurs continuously from exposure to manifestation of disease. *Eli Lilly*, 482 N.E.2d at 471. Neither *Eli Lilly* nor any other Indiana decision defines the point at which manifestation occurs. Disease manifestation was defined, however, in *Eagle-Picher Industries, Inc. v. Liberty Mutual Insurance Co.*, 682 F.2d 12 (1st Cir. 1982).

> *Eagle-Picher* involved a dispute over insurance coverage relative to the plaintiff's manufacture of asbestos-containing insulation and the personal injury litigation that flowed therefrom. The *Eagle-Picher* court rejected the contention that disease manifested itself when a medical diagnosis was made. *Eagle-Picher*, 682 F.2d at 24. "The existence of [a] clinically evident, diagnosable disease is in no way dependent upon actual diagnosis." *Id*. Instead, disease manifests itself "when it becomes clinically evident, that is, when it becomes reasonabl[y] capable of medical diagnosis." *Id*. at 25. Because *Eagle-Picher*'s definition of manifestation best comports with the reasonable interpretation of the language of XL's policies, this Court should adopt *Eagle-Picher*'s definition of manifestation.

*Id*. at 1197-98 (emphasis added).

In the Allocation Order, the trial court ruled that

> *Lilly's* continuous trigger holding controls here, as the Court indicated in the July 23, 2010 Duty to Defend Order …. The members of the plaintiff Association allege delayed manifestation of cancer and other diseases from exposure beginning with their time at the Taoyuan plant or in the dormitories and after. For each claim, each policy in force during the period from first exposure to the chemicals alleged to have cause[d] harm to manifestation of a disease alleged to be related to the exposure is triggered.

51

*Id.* at 42 (footnote omitted). And at the conclusion of the order, the trial court held that "each of the policies in effect from alleged first exposure to alleged diagnosis of disease is triggered[.]" *Id.* at 49.

In appealing the Allocation Order, XL argues that *Lilly*'s "continuous trigger" holding is inapplicable to its post-2001 primary policies because they contain language that purportedly "exclude[s] from coverage injury or damage that occurs 'in part' before the policy begins." XL's AO Br. at 21. Thomson observes that XL had expressly conceded otherwise and argues that

> it is too late for XL to argue this for the first time on appeal. "An issue not raised at trial cannot be advanced for the first time on appeal." *Lea v. Lea*, 691 N.E.2d 1214, 1218 (Ind. 1998); *accord Johnson v. Parkview Health Sys.*, 801 N.E.2d 1281, 1288 (Ind. Ct. App. 2004) ("substantive questions independent in character and not within the issues or not presented to the trial court shall not be first made upon appeal") (quoting *Bielat v. Folta*, 229 N.E.2d 474, 475 (Ind. Ct. App. 1967)).

Thomson's AO Reply Br. at 10-11.

We agree with Thomson on this point. In its response to Thomson's summary judgment motion on trigger, not only did XL expressly concede the applicability of *Lilly*'s "continuous trigger" holding, but it also failed to quote the relevant provisions in its post-2001 primary policies that it now says render that holding inapplicable. This issue is

waived.[20]  *See GKC Ind. Theatres, Inc. v. Elk Retail Investors, LLC*, 764 N.E.2d 647, 651 (Ind. Ct. App. 2002) ("As a general rule, a party may not present an argument or issue to an appellate court unless the party raised that argument or issue to the trial court.…  The rule of waiver in part protects the integrity of the trial court; it cannot be found to have erred as to an issue or argument that it never had an opportunity to consider.  Conversely, an intermediate court of appeals, for the most part, is not the forum for the initial decisions in a case."); *see also Harris v. Traini*, 759 N.E.2d 215, 222 (Ind. Ct. App. 2001) (finding counsel's concession at summary judgment hearing binding on clients), *trans. denied* (2002).

XL also argues that the trial court erred in using diagnosis as the manifestation point for purposes of the "continuous trigger."  In *Lilly*, the court examined three approaches to the trigger of coverage, including the manifestation theory espoused in *Eagle-Picher*, 682 F.2d 12.  In that case, which involved claims resulting from asbestos inhalation, the First Circuit Court of Appeals determined that manifestation occurs when a latent disease "becomes clinically evident, that is, when it becomes reasonably capable of medical diagnosis."  *Id.* at

---

[20]  XL "acknowledges that it did not raise this issue as part of the summary judgment briefing on the Allocation Order," but notes that "there is an upcoming dispositive motions deadline in the trial court [now long since past], and XL will be filing a dispositive motion on this issue."  XL's AO Reply Br. at 7 n.8.  In the September 2013 order on motions for partial summary judgment, the trial court correctly ruled that it could not "revisit the issue of trigger, having already decided – in a final judgment now on appeal [i.e., the Allocation Order] – that all of XL's policies are triggered.  XL failed to raise the clause when the issue of trigger was before the Court."  September 2013 Order at 10.  XL also asserts that it "joined and adopted [Zurich's] arguments on this specific issue in prior summary judgment briefing.  Thus, the issue is not waived and, if the merits are reached, this Court should reverse on this issue."  XL's AO Reply Br. at 7 n.8 (citing XL's AO Supp. App. at 45, 22-26).  We disagree. Zurich's argument addressed only the "known loss" doctrine and did not mention *Lilly*'s "continuous trigger" holding.  Moreover, Zurich's argument was raised in response to Thomson's motion for summary judgment on defense costs, and XL's joinder in that argument was filed almost a year before its response to Thomson's motion for summary judgment on trigger and other issues. XL had ample opportunity to apply Zurich's arguments to the trigger issue at the trial court level, but it failed to do so.  It may not raise the issue for the first time on appeal.

53

25. In so deciding, the First Circuit rejected the district court's definition of manifestation as "'the date of actual diagnosis' or the date of death," noting that "[t]he existence of clinically evident, diagnosable disease is in no way dependent upon actual diagnosis." *Id*. at 24.

XL contends that

> [t]he distinction between the date of diagnosis and the date a disease **becomes capable of diagnosis** is especially relevant here. To the extent that the plaintiffs in the Taiwan Class Action had symptoms or illnesses that made their alleged disease capable of diagnosis before the policy periods of the XL Policies, those Policies would not be triggered under Lilly, which held that coverage is triggered between exposure and manifestation. 482 N.E.2d at 471. Even if a plaintiff's disease was diagnosed during or after the XL Policies' policy periods, the "manifestation," i.e. the end point for the multiple trigger, would have occurred prior to the inception of the XL Policies. Accordingly, to the extent that the "continuous trigger" applies, the trial court's ruling on this issue should be reversed to reflect that the XL Policies are [no longer] triggered [once] a disease becomes capable of diagnosis.

XL's AO Br. at 30.

We agree with XL on this point. XL's policies require that bodily injury "occur" during the policy period, not that it be medically diagnosed during the policy period. *Cf. Eagle-Picher*, 682 F.2d at 24 ("The policy language clearly requires that exposure result in bodily injury during the policy period, not that the injury be medically diagnosed during the policy period. The existence of clinically evident, diagnosable disease is in no way dependent upon actual diagnosis."). Because our supreme court in *Lilly* specifically cited *Eagle-Picher*'s manifestation theory in its trigger analysis and held that manifestation is the end point of the continuous trigger, we are unwilling to depart from *Eagle-Picher*'s definition of manifestation. Therefore, we affirm the trial court's application of *Lilly*'s "continuous

54

trigger" holding but reverse and remand with instructions to follow *Eagle-Picher* in determining manifestation, should that be necessary down the road.

## Section 8 – Applicability of "All Sums" Allocation Method to XL/Century Policies

In the Allocation Order, the trial court ruled on the allocation issue as follows:

> Under Indiana law, any triggered policy in a delayed manifestation liability [sic] provides indemnity to the policyholder for the entire amount which the policyholder must pay as a result of an occurrence, subject only to policy limits. Insurers are not free to limit their responsibility only to the portion of injury which allegedly takes place in the policy period. *See Allstate Ins. Co. v. Dana*, 759 N.E.2d 1049, 1058 (Ind. 2001) ("*Dana II*"). This Court previously rejected XL's claim that it is entitled to a pro rata allocation on the duty to defend. The same insurer arguments, which rest upon the same policy language, are no more persuasive as to indemnity.

> *Dana II* involved insurance coverage for environmental cleanups in nineteen states where the contamination occurred over the span of several years. The Indiana Supreme Court considered whether the policies' promise to indemnify the insured was limited by any language in the policies to cover only that part of injury taking place in the policy period. The Court found no such limitation, rejecting the insurer's argument that it should be responsible only for the portion of damages that occurred during a particular policy period. *Id*.

> Thus, under *Dana II*, once a policy is triggered, that policy is liable for the entire amount of damages for which the policyholder is liable, up to the policy's limits. *Id*. Nothing in the language of the policies limits the insurer's obligation to "some sums," "part of the sums," or that proportion of the damage that took place during the policy period. As the *Dana II* Court explained, although further damage may take place over time, once an occurrence triggers coverage, coverage is for *all* sums related to that occurrence:

>> [T]here is no language in the coverage grant, including the definition of "property damage," "personal property," or "occurrence," that limits [the insurer's] responsibility to indemnification for liability derived solely for that portion of damages taking place during the policy period. By the policy's terms, once an accident or event resulting in [the insured's] liability—an occurrence—takes place within the policy period,

55

> [the insurer] must indemnify [the insured] for "all sums" [the insured] must pay as a result of that occurrence, subject to the policy limits…[W]hether or not the damaging effects of an occurrence continue beyond the end of the policy period, if coverage is triggered by an occurrence, it is triggered for 'all sums' related to that occurrence.

*Dana II*, 759 N.E.2d at 1057-58 (emphasis added).

> In this case, the policies designated use the words "those sums" and not "all sums." This does not change the result. The use of "those" instead of "all" does not constitute the clear proration language *Dana II* noted insurers would need to support proration, and this Court finds that the insurers' use of "those sums" rather than "all sums" constitutes a difference without a distinction.

> *Dana II* requires that any proration terms must be precise and clear to govern. No such terms are found in ACE's or XL's policies. The coverage obligation for the Taiwan Class Action, whether defense or immunity, is joint and several. The Court enters summary judgment for Thomson on this point of coverage for the Taiwan Class Action.

Thomson's AO App. at 43-44 (citation omitted).

XL and Century contend that the trial court's reliance on *Dana II* is misplaced and that the proration terms in its policies are unambiguous and should dictate a different result.[21] At issue in *Dana II* was Allstate's liability to Dana under excess liability policies dating from 1977 through 1982. "Much of the disputed cost [was] for remediation of contaminated ground water." *Dana II*, 759 N.E.2d at 1053.

The 1977, 1978 and 1979 policies provide[d] the following coverage grant:

I. Coverage

---

[21] Century adopts XL's arguments on this issue pursuant to Indiana Appellate Rule 46(B)(1). Century's AO Br. at 5 n.5.

56

The Company hereby agrees, subject to the limitations, terms and conditions hereinafter mentioned, to indemnify the insured for all sums which the insured shall be obligated to pay by reason of the liability
A. imposed upon the Insured by law, or
B. assumed under contract or agreement by the Named Insured,
for damages on account of
A. Personal Injuries
B. Property Damage
C. Advertising Liability, caused by or arising out of each Occurrence happening anywhere in the world.

The 1980 and 1981 policies provide[d]:

A. Coverage:
To indemnify the INSURED for the ULTIMATE NET LOSS, in excess of the greater of the RETAINED LIMIT, or UNDERLYING LIMIT, for all sums which the INSURED shall be obligated to pay by reason of the liability imposed upon the INSURED by law or liability assumed by the INSURED under contract or agreement for damages and expenses, because of:
(1) PERSONAL INJURY,
(2) PROPERTY DAMAGE, or
(3) ADVERTISING LIABILITY to which this policy applies, caused by an OCCURRENCE, happening anywhere in the world.

*Id*. at n.3.

Allstate contended that it was "responsible only for the portion of damages incurred in a particular policy period" and argued "for a proportional allocation of damages among each triggered policy period." *Id*. at 1057. The *Dana II* court concluded,

there is no language in the coverage grant, including the definitions of "property damage," "personal injury," or "occurrence," that limits Allstate's responsibility to indemnification for liability derived solely for that portion of damages taking place within the policy period. By the policy's terms, once an accident or event resulting in Dana's liability—an occurrence—takes place within the policy period, Allstate must indemnify Dana for "all sums" Dana must pay as a result of that occurrence, subject to the policy limits. We agree with the Court of Appeals that whether or not the damaging effects of an occurrence continue beyond the end of the policy period, if coverage is

57

triggered by an occurrence, it is triggered for "all sums" related to that occurrence.

*Id.* at 1058.

The XL policies at issue read in pertinent part as follows:

**SECTION I – COVERAGES**

**COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

1. **Insuring Agreement**

   a. We will pay *those sums* that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.…

   ….

   b. *This insurance applies to "bodily injury" and "property damage" only if:*

      (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

      (2) *The "bodily injury" or "property damage" occurs during the policy period ….*

*See, e.g.*, Thomson's AO App. at 345 (emphases added). We presume that the applicable Century policies contain substantially similar language, and Thomson does not contend otherwise.

We have found no Indiana state appellate decisions that examine the italicized language in the allocation context. Where no Indiana case law is on point, we may look to federal cases as persuasive authority. *The Blakely Corp. v. EFCO Corp.*, 853 N.E.2d 998,

1004 (Ind. Ct. App. 2006). In *Trinity Homes LLC v. Ohio Casualty Insurance Co.*, 864 F. Supp. 2d 744 (S.D. Ind. 2012), Judge Barker was confronted with nearly identical language. At issue in that case were policies issued to two affiliated homebuilding entities, Trinity and Beazer, from 1994 through 1999. Beginning in 2002, purchasers of the homes filed claims against Trinity and Beazer, "alleging that the faulty work of [its] subcontractors resulted in water intrusion, which in turn damaged various components of the purchasers' homes." *Id.* at 747. Trinity initiated a remediation protocol, and Trinity and Beazer reached a class settlement resulting in the payment of over $58,000,000 in investigative and repair costs. Trinity and Beazer filed a declaratory judgment action against their insurer, Ohio Casualty, and both sides moved for summary judgment.

Judge Barker addressed the allocation issue as follows:

> The final issue raised by the cross motions for summary judgment is whether coverage exists for "all" damages for which Trinity becomes liable arising out of each occurrence or whether it is liable only for "those" damages which arose during the relevant policy period.

> In [*Dana II*], the Indiana Supreme Court interpreted Allstate insurance policy provisions stating that it would pay "all sums" which Allstate "shall be obligated to pay" based on property damage "caused by an occurrence," to provide indemnification for "all sums," not just those sums accruing as a result of damages which arose during the policy period. We have previously interpreted policy language similar to the indemnity language before us as being distinguishable from that at issue in *Dana II*.

> *Irving Materials, Inc. v. Ohio Cas. Ins. Co.*, 2008 WL 687126 (S.D. Ind. March 10, 2008), was a case involving multiple insurers and multiple policies, and damages arising over multiple coverage periods, not unlike the circumstances here emanating from the class settlement …. In *Irving Materials*, we examined the following provision of another Ohio Casualty policy:

59

We will pay on behalf of the "Insured" those sums in excess of the "Retained Limit" that the "Insured" becomes legally obligated to pay by reason of liability imposed by law or assumed by the "Insured" under an "insured contract" because of … "property damage,"…. that takes place during the Policy Period and is caused by an "occurrence" happening anywhere.

*Id*. at *5. We addressed the differences between this language and the "all sums" provision discussed in *Dana II*, and questioned the reasoning of a ruling by the Lake Superior Court in *State Farm Fire & Casualty v. Anthony J. Cefali*, Cause No. 45D04-0507-PL-00030, 2007 WL 1152987 (Jan. 25, 2007), proffered by Trinity as support for a conclusion that the policy provision of "those sums," is not actually distinguishable from "all sums" and, therefore, Ohio Casualty, like the insurer in *Dana II*, is on the hook for all the damages arising from each occurrence.

In undertaking our analysis in *Irving Materials*, in contrast to the situation in *Cefali*, we were not focused exclusively on the distinction between "those sums" and "all sums."[22] Rather, we found persuasive the fact of additional specific policy language providing that the insurer would indemnify property damage "that takes place during the Policy Period." Here, as in *Irving Materials*, the policy not only uses the term "those sums" in lieu of "all sums," it further qualifies its indemnity obligation, as evidenced by the highlighted language below:

> § I(1)(a)—We will pay those sums that the Insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies….
>
> (b)—**This insurance applies to** "bodily injury" and **"property damage" only if:**
>
>> (1) the "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and
>>
>> (2) **the** "bodily injury" or **"property damage" occurs during the policy period.**

---

[22] We note that XL and Century relied on *Irving Materials* and that Thomson relied on *Cefali* at the trial court level and on appeal. *Trinity Homes* was decided in March 2012, when briefing of the appeal from the Allocation Order was underway.

> Accordingly, we reach here the same conclusion we did in *Irving Materials*, namely, that Ohio Casualty is obligated to indemnify Trinity only for damages arising during its policy periods for pro rata liability as opposed to several and indivisible, by reason of its having limited its indemnity obligation to "those sums" that Trinity becomes liable to pay for property damage which "occurs during the policy period."

*Id.* at 758-59 (footnote omitted); *accord Crossmann Communities of N.C., Inc., v. Harleysville Mut. Ins. Co.*, 717 S.E.2d 589, 600 (S.C. 2011) (adopting pro rata approach in case involving "standard CGL" policies with same "key language," including "those sums"; "The insurance applies '**only if** … [t]he "bodily injury" or "property damage" occur[red] during the policy period.' In other words, the insurance **does not apply** to property damage that did not occur during the policy period.").

We find the reasoning in *Trinity Homes* persuasive and agree with Judge Barker that *Dana II* is not controlling in cases involving the decisively different policy language at issue here. Judge Barker's interpretation gives effect to the plain meaning of the limiting phrases "those sums" and "during the policy period" and does not render any of the remaining language meaningless. The cases cited and arguments made by Thomson focus almost exclusively on the distinction between "all sums" and "those sums" and ignore the critical phrase "during the policy period," and therefore we do not find them persuasive or as evidence of an ambiguity, as Thomson insists. Thomson contends that if either XL or Century "actually wanted to require proration of payment to only that portion of bodily injury which takes place in a policy period, it could and should have said so directly." Thomson's AO Reply Br. at 17. We think that they said so directly enough.

61

Thomson further argues,

> With long tail claims like those in this case, how would a court determine exactly when and in what quantum the "bodily injury" occurred? We do not understand many of the mechanisms by which chemical exposure may cause cancer. How would the Court decide if 10% or 15% or 50% should be attributed to any one year?

*Id.* The problems posed by Thomson are difficult, but by no means insurmountable. The Supreme Judicial Court of Massachusetts has observed that "[c]ourts in other jurisdictions have struggled to define the scope of coverage where successive CGL policies are triggered by long-tail claims for injuries which take place over many years and are caused by environmental damage or toxic exposure." *Boston Gas Co. v. Century Indem. Co.*, 910 N.E.2d 290, 301 (Mass. 2009).

> Determining the proper method for prorating losses raises a myriad of issues, which have caused courts to adopt several different pro rata allocation methods in cases involving long-tail claims. See S.M. Seaman & J.R. Schulze, Allocation of Losses in Complex Insurance Coverage Claims § 4.3[b], at 4-17–4-21 (2d ed. 2008). The ideal method is a "fact-based" allocation, under which courts would "determine precisely what injury or damage took place during each contract period or uninsured period and allocate the loss accordingly." *Id.* at § 4.3[b][1], at 18. "Although such an allocation is the most consistent with the contract language, the inability to make such determinations or the litigation costs associated with such an exact allocation has caused courts to use various proxies for deriving fair apportionment." *Id.*

*Id.* at 312.

In *Boston Gas Co.*, the court discussed "the 'two primary means of apportioning liability on a pro rata basis' where a fact-based allocation is not feasible": the "time on the risk" approach and the "years and limits" approach. *Id.* (quoting *EnergyNorth Natural Gas,*

*Inc. v. Certain Underwriters at Lloyd's*, 934 A.2d 517, 523 (N.H. 2007)).[23]  Each approach

has its perceived advantages and disadvantages, as will any other approach that attempts to

---

[23]  Under the "time on the risk" approach,

> "each triggered policy bears a share of the total damages [up to its policy limit] proportionate to the number of years it was on the risk [the numerator], relative to the total number of years of triggered coverage [the denominator]." 23 E.M. Holmes, Appleman on Insurance § 145.4[A] [2][b], at 24 (2d ed. 2003).  "Apportioning costs among all triggered years is compatible with having determined that some injury or damage resulted in all of those years.  Consistent with the contract language, an insurer pays its percentage of loss attributed to its policy period." *Id*. at 29.

*Boston Gas Co.*, 910 N.E.2d at 313.  Under the "years and limits" approach,

> "… loss is allocated among policies 'based on both the number of years a policy is on the risk as well as that policy's limits of liability.  The basis of an individual insurer's liability is the aggregate coverage it underwrote during the period in which the loss occurred.' …  Under this approach, 'an insurer's proportionate share is established by dividing its aggregate policy limits for all the years it was on the risk for the single, continuing occurrence by the aggregate policy limits of all the available policies and then multiplying that percentage by the amount of indemnity costs.'"

*Id*. (quoting *EnergyNorth*, 934 A.2d at 523 (quoting 23 E.M. HOLMES at § 145.4[A][2][c] and Colon, *Pay it Forward:  Allocating Defense and Indemnity Costs in Environmental Liability Cases in California*, 24 INS. LITIG. REP. 43, 60 (2002)).

fairly apportion liability among multiple insurers and policies and periods.[24]  A close

approximation of a fact-based allocation may be achievable in some cases and not in others,

but the overriding goal of apportionment should be to give effect to the unambiguous

language of the policy and to avoid a significant windfall or shortfall to the insured.  We

---

[24]  According to the *Boston Gas* court,

> "[T]he time-on-the-risk method offers several policy advantages, including spreading the risk to the maximum number of carriers, easily identifying each insurer's liability through a relatively simple calculation, and reducing the necessity for subsequent indemnification actions between and among the insurers."  *Towns v. Northern Sec. Ins. Co.*, 964 A.2d 1150, 1166 (Vt. 2008).  However, "[c]ritics of pro-ration by years note that it fails to consider the limits of each policy because a policy with very low limits of liability may be liable for the same amount as a policy with much greater limits, despite the likely disparity in the premium paid by the insured to the carrier(s)."  23 E.M. Holmes, *supra* at § 145.4[A][2][b], at 25 n.109.
>
> ….
>
> …. The rationale for allocating [by years and limits] is "that insurers who provided more coverage, that is, higher limits or lower deductibles, assumed more of the risk of liability than insurers who provided less coverage."  Comment, Allocating Progressive Injury Liability Among Successive Insurance Policies, 64 U. Chi. L. Rev. 257, 274-275 (1997).  "A major criticism of pro-ration by years and limits is that insurers with higher limits may be liable for a disproportionate share of damages based solely on their limits."  23 E.M. Holmes, *supra* at § 145.4[A][2][c], at 30 n.133.

910 N.E.2d at 313.  Ultimately, the court determined that

> the time-on-the-risk method of allocating losses is appropriate where the evidence will not permit a more accurate allocation of losses during each policy period.  "[I]ts inherent simplicity promotes predictability, reduces incentives to litigate, and ultimately reduces premium rates."  Comment, *supra* at 281.  The … method of prorating by years and limits "disproportionately assign[s] liability to generous policies, disproportionately increasing their price, thus making them more difficult to purchase."  Comment, *supra* at 276.  Moreover, "[p]rogressive injuries by definition do not … magically gravitate toward periods with more coverage."  *Id*. at 283.  Although either method would require us to indulge in a "probable fiction," *Boston Gas Co. v. Century Indem. Co.*, 529 F.3d 8, 14 (1st Cir. 2008), we conclude that the more reasonable fiction to adopt is that the progressive injuries took place evenly across all policy periods.  Proration by time on the risk reflects this "probable fiction."  *Id*.  See 1 A.D. Windt, Insurance Claims and Disputes § 6:47, 6–418—6–419 (5th ed. 2007) ("the most equitable [method of proration] is allocating based upon the relative periods of time each insurer was on the risk, and the courts have, in general, so recognized").

*Id*. at 314-15.

decline to adopt a particular approach in this case, in which the liability of the Thomson entities has yet to be determined in an unfamiliar legal system. Instead, we believe that the trial court will be best situated to select (and customize, if necessary) the fairest method of apportioning liability among the insurers in light of the factual complexities of the case at the appropriate time. And for that reason, we believe that the trial court should be afforded broad discretion in selecting and applying an apportionment method. Therefore, we reverse and remand for further proceedings on this issue.

**Section 9 – Whether TCETVT and Thomson SA are Insureds Under XL's Policies**

The next three issues arise from the XL Defense Costs Order, which reads in pertinent part as follows:

### I. SUMMARY

On October 5, 2011, [Thomson] filed its "Motion for Summary Judgment for Defense Costs in the Amount of $7,321,261.06 for Defense of the Taiwan Class Action."… For the reasons given here, the Court now GRANTS this motion in part, and awards Thomson judgment for its defense costs incurred after July 8, 2008, through April 30, 2011 in the sum of $2,950,196.34 against defendant [XL]. Thomson also is entitled to prejudgment interest on these costs, in the sum of $413,473.05 through August 1, 2011 and $646.25 for each day thereafter. Thomson has continued to accrue defense costs after April 30, 2012. XL further is ordered (1) to reimburse all costs pertaining to defense incurred since April 30, 2011 and pay all such costs to which it has no specific objection within 30 days of this order; and (2) to establish a means by which further costs may be paid within 30 days after they are paid by Thomson.

### II. BACKGROUND

On July 23, 2010 this Court ordered Thomson's three primary insurers to defend Thomson. After the [Duty to Defend Order] was entered one

65

primary insurer, Zurich, settled all disputes with Thomson, as did one umbrella insurer, Lumbermens. In addition, a second insurer, ACE, has settled its obligation to Thomson on defense costs through December 31, 2011. The third primary insurer, XL, has not contributed anything to any defense costs, either before or after the [Duty to Defend Order]. Thomson therefore brought the instant motion.…

To decide this motion the Court must decide four issues:

1. By what standard is a trial court to address a request for reimbursement of defense costs against an insurer which has breached the duty to defend?

2. Were the costs incurred reasonable and necessary to the defense of the Taiwan Class Action?

3. Were the defense costs reasonable and necessary to the defense of Thomson in that Class Action?

4. Is TCETVT also an insured entitled to a defense in the Taiwan Class Action under the XL policies?

## III. ANALYSIS

A. The standard for review of defense cost reimbursement by an insurer

XL does not dispute that the defense costs at issue were incurred or paid. There is also no dispute XL has not paid any defense costs, even after the [Duty to Defend Order], and therefore has breached that duty to defend. This Court is asked to determine if the defense costs incurred and paid are reasonable and necessary.

How is this Court to address this task? Thomson cites numerous cases, many from the Seventh Circuit but also from other courts coast to coast, that hold that when an insurer has breached the duty to defend, and the policyholder has secured, supervised, and paid for a defense without any expectation of payment, those costs are "market tested" and are presumed to be "reasonable and necessary." *Taco Bell v. Continental Casualty Co.*, 388 F.3d 1069, 1075-77 (7th Cir. 2008); *Metavante Corp. v. Emigrant Savings Bank*, 619[]F.3d 748, 772-776 (7th Cir. 2010) ($10 million in fees); *Charter Oak Fire Ins. Co. v. Hedeen & Cos.*, 280 F.3d 730, 738-39 (7th Cir. 2002); *Sentex*

66

*Systems, Inc. v. Hartford Accident and Indemnity Co.*, 882 F. Supp. 930, 946-47 (C.D. Cal. 1995) affirmed 93 F.3d 576 (9th Cir. 1996); *American Service Ins. Co. v. China Ocean Shipping Co.*, 932 N.E.2d 8, 23-24 (Ill. Ct. App. [2]010; 3-17 Appleman on Insurance § 17.07 (Ins. Library Ed. 2011).  XL did not cite a single contrary case.

This presumption rests on two principles.  First, the policyholder, which is defending itself without an assurance it will be reimbursed, provides a market-based check on the amounts spent, a better check than any court can provide after-the-fact.  Second, it is unfair to let a breaching insurer nit-pick costs later when it could have—had it honored its duty to defend—initially directed the defense in any reasonable way it wished.  *Taco Bell*, 388 F.3d at 1077.

This Court agrees.  Thomson's fees are presumed to be reasonable and necessary.  XL's expert evidence criticizing general billing practices is unavailing here, just as similar insurer analyses were rejected in *Taco Bell* and its progeny.  The market has checked the fees, and the insurer cannot second guess the work done or amounts paid where it has failed to accept its defense duty.  In any event, as shown below, XL has presented no competent evidence that any particular defense action or cost was not reasonable or necessary.

B.      Thomson's defense costs were "reasonable and necessary"

Each side presented a very different approach to the Court for deciding what is "reasonable and necessary."  Thomson relies on the expert support of G. Ferguson McNeil.  Mr. McNeil is a partner at Vinson & Elkins who has defended toxic tort, class action cases in foreign countries which like Taiwan do not have developed Western-style legal systems.  He examined the actions taken and the firms used to discharge the defense here, and reached what Thomson calls a "total value" conclusion.  He based his opinion on the various factors set forth in Rule 1.5 of the Code of Professional Conduct—not just the time involved in tasks but the novelty and difficulty of the matter, and the skill,

experience, reputation and ability of the lawyers involved.[25] He concluded the costs were reasonable and necessary.

XL took a very different approach. It relies nearly completely on the opinion of Jack Pierce. Mr. Pierce has never litigated or managed a toxic-tort, class action anywhere, and not in a developing, non-Western legal system. He did not apply Rule 1.5 as the standard; his written report expressly rejects it. His claimed expertise is in reviewing legal bills and identifying practices he claims lead to overbilling. Importantly, he did not identify a single defense action which was not necessary to the defense of Thomson in Taiwan, or a single specific action which was overbilled.

This Court is persuaded that Mr. McNiel's approach is more sound and more consistent with Indiana law. Our courts have expressly adopted Rule 1.5 as the standard for what is reasonable. *Terry Gerstbauer v. Styers*, 898 N.E.2d 369, 381 (Ind. Ct. App. 2008). The analysis is case-specific. What matters is what is reasonable and necessary to defend the particular case at issue. The Taiwan action is novel and complex. Mr. McNiel's expertise in similar cases is the probative expertise.

Rule 1.5 mandates a multi-factor total value approach. In addition to time spent, the Court is to consider novelty, difficulty, skill, experience, reputation, and ability. Mr. Pierce focuses only on time and billing practices affecting the amount of time recorded. He makes no adjustment for any of the 1.5 factors, such as upward adjustments for skill or efficiency. His method is thus biased downward, and does not comport with Rule 1.5.

---

[25] Indiana Professional Conduct Rule 1.5(a) provides,

> A lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses. The factors to be considered in determining the reasonableness of a fee include the following:
> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
> (3) the fee customarily charged in the locality for similar legal services;
> (4) the amount involved and the results obtained;
> (5) the time limitations imposed by the client or by the circumstances;
> (6) the nature and length of the professional relationship with the client;
> (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
> (8) whether the fee is fixed or contingent.

Mr. Pierce's criticisms center on lawyer billing practices, in particular "block billing," which he alleges tends to inflate time entries. This Court is not persuaded, for several reasons. First, logically, there is no basis to conclude that block billing results in inflated time; it could as easily lead to lost time. Second, Indiana cases expressly acknowledge and permit the practice. *Greenfield Mills, Inc. v. Carter*, 569 F.Supp.2d 737, 748 (S.D. Ind. 2008); *Fulmore v. Home Depot, USA, Inc.*, 2007 WL 2746882 and 4; *Clark v. Oakhill Condominium Association, Inc.*, 2001 U.S. Dist. LEXIS 35228 at 20-27 (N.D. Ind. 2011). Third, Mr. Pierce's analysis neglects that the work has been reviewed by Meggan Ehret, Thomson's in-house counsel, who has every incentive to minimize legal costs. The cases upon which Mr. Pierce relies are first-level reviews in statutory fee-shifting cases, where no one has supervised or reviewed the bills prior to the court's assessment. *E.g., Moore v. University of Notre Dame*, 22 F.Supp.2d 896, 913 (N.D. Ind. 1998) (an age discrimination case, the only Indiana case he cites in his report on this issue.) There is no prior market check in such cases. But even such cases, including *Greenfield Mills*, *Fulmore* and *Clark* as well as *Moore*, do not proscribe block billing.

Mr. Pierce's other critiques are no more persuasive. He claims time spent pursuing indemnity claims against third parties should be excluded. Such work, however, actually assists the insurers by minimizing what they must pay. That is why courts have routinely allowed such costs. *Great Western Cas. Co. v. Marathon Oil Co.*, [3]15 F.Supp.2d 879, 881-85 (N.D. Ill. 2003); *Oscar W. Larson v. United Capital Ins. Co.*, 845 F. Supp. 458, 461 (W.D. Mich. 1993); 3-17 *Appleman on Insurance* § 17.07 (Ins. Library Ed. 2011). XL cites no contrary case.[26]

Next, Mr. Pierce critiques charges for which [sic] he claims are "administrative" tasks, or for response to the insurers' inquiries. This includes maintaining the Sharepoint website, which has furnished information the insurers needed; on it they access billings and monitor the underlying defense. These costs help the insurers, and Thomson is entitled to be reimbursed for them.

---

[26] XL contends that *Recticel Foam*, 716 N.E.2d 1015, holds that Thomson cannot seek recovery of "fees and expenses related to this insurance coverage action" or "fees and expenses related to its offensive indemnification claims[.]" XL's XO Br. at 37. Because *Recticel Foam* does not specifically hold that indemnification costs can never be recoverable as defense costs and does not address the issue of coverage actions, we do not find it persuasive. *Cf. Great W. Cas. Co.*, 315 F. Supp. 2d at 882-83 ("'Defense' is about avoiding liability. Claims and actions seeking third-party contribution and indemnification are a means of avoiding liability just as clearly as is contesting the claims alleged to give rise to liability. A duty to defend would be nothing but a form of words if it did not encompass all litigation by the insured which could defeat its liability, including claims and actions for contribution and indemnification."). We note that the coverage action would not have been necessary if XL had not refused to defend Thomson.

Finally, Mr. Pierce complains certain entries are too vague. This ignores two critical facts. First, Thomson has scrutinized these costs each month with knowledge of the case and incentives to not over-spend. Second, if the insurers wanted more detail, they could have gotten it had they timely honored their duty to defend. The Court notes that Mr. Pierce made no further inquiry as to any of those entities, and does not claim that any of the work described was unnecessary or unreasonable.

In sum, the Court holds that (1) the defense costs are presumed to be reasonable and necessary, but (2) even if this presumption was not dispositive, the competent, relevant evidence supports the conclusion that the costs incurred were reasonable and necessary. The Court holds that XL's evidence on these costs is not competent, and in any event does not create a genuine issue of material fact because it rests upon the wrong standard and does not show that any specific defense action or cost was unreasonable or unnecessary.

C.     Were the defense costs incurred reasonable and necessary to the defense of Thomson?

XL claims it is not obligated to pay any of these costs because Thomson Inc. has not appeared in the underlying action and TCETVT has paid those defense costs to date. The motion to dismiss Thomson Inc. on a variety of grounds continues to pend in the underlying case, but it likely will not be decided until the underlying case is at an end.

This Court resolved this issue in large part in its [Duty to Defend Order], when it held that payment by TCETVT was no defense to XL:

> Thomson is entitled to a full defense against the allegations. A full defense includes, but it not limited to, asserting any Thomson jurisdictional defense. It does not mean the other actions needed to defend the rest of the case do not benefit XL or are not necessary to discharge its defense obligations. The success of Thomson's jurisdictional defense will not be known until the end of the Taiwan action. A complete defense is needed to protect Thomson from whatever may happen.

[Duty to Defend] Order, at p. 12.

The "full defense" to which Thomson is entitled includes defense against the merits of the underlying claims. Mr. McNiel specifically opined

70

that the defense actions here were all reasonable and necessary to protect all the Thomson entities. XL did not present any contrary evidence. The Court concludes that Thomson has demonstrated that the defense actions were reasonable and necessary to Thomson Inc.'s "full defense."

### D.    Is TCETVT also an insured entitled to a defense?

The Court's holding that defense costs incurred after July 8, 2008 are reasonable and necessary to the defense of Thomson Inc. is fully sufficient to support Thomson's motion. But Thomson argues that there is [a] second, independent basis for that decision, that T[C]ETVT also is an insured entitled to a defense.

This decision turns on analysis of two endorsements to XL's policies. Using XL's 2002 policy as an example, the first endorsement makes Thomson SA, Thomson Inc.'s direct parent, an insured, by amending the "Who is an Insured" (Section II)[] of the policy to:

> Include as an insured the … organization(s) shown in the Schedule, but only with respect to their liability arising out of:
>
> a.    Their financial control of you …

Thomson SA is in the Schedule. This "financial control" is precisely applicable to the situation here, where there are veil-piercing allegations in the underlying case against Thomson.

A second endorsement completes inclusion of TCETVT. This is the "International Extended General Liability Endorsement" ("IEGLE"). It includes a "Broad Form Named Insured Endorsement," which again amends Section II, this time to include as an insured:

> (1) Any subsidiary and subsidiary thereof of yours which is a legally incorporated entity of which you own a financial interest of more than fifty percent (50%) of the voting stock on the effective date of the coverage part …

As the ownership chart attached shows, Thomson SA indirectly owns almost all the shares of TCETVT through two subsidiaries (Thomson Inc. owns the rest). Thus TCETVT is an insured through Thomson SA's ownership.

71

XL's defense is that "you" and "your" are described elsewhere in the policy to "refer to the Named Insured shown in the Declaration," which it claims is only Thomson Inc. The problem with this reading is that "you" and "your" also expressly includes "any other person qualifying as a Named Insured under this policy." "Named Insured" is not defined. How does one "qualify" to be a "Named Insured?" The only logical answer is via the endorsements described. The IEGLE supplies such a qualifying provision, under the heading "Broad Form Named Insured," that includes TCETVT. What else is the point of a "Broad Form Named Insured" endorsement but to "broaden" the "Named Insured?" This also comports with the general purpose of the endorsement, to furnish "broad" foreign liability protection for Thomson companies operating in foreign countries.

Even if XL's narrow construction were reasonable, that would still leave, at the very least, an ambiguity. Thomson's construction is at the least a reasonable one. As Indiana courts have held many times, where more than one reasonable construction of a policy term is possible, there is ambiguity. *Eli Lilly & Co. v. Home Ins. Co.*, 482 N.E.2d 467, 470-71 (Ind. 1985). Ambiguous policy terms are interpreted in favor of a liability policy's basic purpose of indemnity. *Lilly*, 482 N.E.2d at 470; *American States Ins. Co. v. Kiger*, 662 N.E.2d 945, 947 (Ind. 1996). The policyholder's construction need not be the best or only possible construction to prevail; if any reasonable construction of a term supports coverage, that construction governs as a matter of law. *Lilly*, 482 N.E.2d [at 144].

A fair reading of XL's terms includes Thomson SA and TCETVT as insureds (and "Named Insureds") entitled to a defense against just this sort of veil-piercing international toxic tort claim. The lack of clarity or restriction on what constitutes a "Named Insured," or how one "qualifies" (other than by inclusion in endorsements) as a "Named Insured," coupled with the lack of restraint of defense to any particular form of "insured," doom XL's after-the-claim restrictive construction. TCETVT is entitled to a defense in its own right.

Finally, even if TCETVT did not qualify as a Named Insured under XL's primary policies, it does under XL's umbrella policies. XL's umbrella insures Thomson and "any company for which you exercise control or actively manage." That describes TCETVT—a company with no employees or facilities which Thomson "actively manages." If the primary doesn't cover or defend, the umbrella drops down to do so. The result is the same. TCETVT is entitled to a defense.

72

XL's XO App. at 60-69 (some citations and footnotes omitted).

## Section 9.1 – XL's Primary Policies

As indicated above, the trial court determined that both TCETVT and Thomson SA are insureds under XL's primary policies based primarily on two endorsements: the Additional Insured – Controlling Interest Endorsement ("AICIE") and the International Extended General Liability Endorsement ("IEGLE"). The AICIE names Thomson SA in the schedule and provides in pertinent part,

> 1.  WHO IS AN INSURED (Section II) is amended to include as an insured the person(s) or organization(s) shown in the Schedule, *but only with respect to* their liability arising out of:
>
>     a.  Their financial control of you[27]; or
>
>     b.  Premises they own, maintain or control while you lease or occupy these premises.

*See, e.g.*, Thomson's XO App. at 138 (emphasis added).

XL notes that in the insurance context, the phrase "arising out of" has been held to require a causal connection. *See Grinnell Mut. Ins. Co. v. Ault*, 918 N.E.2d 619, 626 (Ind. Ct. App. 2009) ("[T]he [plaintiffs] do not dispute that the phrase 'arising out of' connotes a causal connection between an insured's business activities and a victim's injuries."). XL argues,

> Here, no such causal connection exists. Thomson (SA) is not being sued for liability caused by its control of Thomson or premises leased or

---

[27] Section I of the policies provide, "Throughout this policy the words 'you' and 'your' refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy." *See, e.g.*, Thomson's XO App. at 122. Thomson is shown as the only named insured on the policies' common declarations pages. *Id*. at 119.

73

occupied by Thomson. The liability which the Taiwan plaintiffs seek to impose on Thomson (SA) arises out of Thomson (SA)'s indirect financial control of TCETVT and its premises. The allegations against Thomson (SA) have nothing to do with its financial control of Thomson Inc., or premises owned by Thomson (SA) but leased or occupied by Thomson Inc.

XL's XO Br. at 24.

Thomson argues that "Thomson SA's potential liability does 'arise out of' financial control of Thomson Inc. and all the Thomson entities. 'Financial control' is an undefined term. It describes the veil piercing theory and joint liability claim made against the three Thomson entities to the Taiwan Class Action." Thomson's XO Br. at 35. We agree with Thomson.

We now turn to the IEGLE, which reads in pertinent part,

**1. Broad Form Named Insured**

Paragraph 1. of Section II – Who is an insured is amended to include the following:

d. (1) Any subsidiary and subsidiary thereof of yours which is a legally incorporated entity of which you own a financial interest of more than fifty percent (50%) of the voting stock on the effective date of the coverage part, then you are an insured ....

Thomson's XO App. at 164.

XL asserts,

The only entity that is shown in the Declarations is Thomson Inc. (or one of its predecessors). Clearly, ownership of less than one percent (1%) of TCETVT by Thomson does not trigger coverage for TCETVT under this Endorsement. As a matter of law, TCETVT is not an insured under this policy language because a less than one percent (1%) interest is not an "interest of more than fifty percent (50%)."

XL's XO Br. at 26. XL's argument disregards the fact that Thomson SA also qualifies as an insured under the AICIE and owns TCEB, which owns 99% of TCETVT.[28] Therefore, we affirm the trial court's ruling that Thomson SA and TCETVT are insureds under XL's primary policies.

<b>Section 9.2 – XL's Umbrella Policies</b>

XL does not dispute the trial court's observation that its umbrella policies insure "Thomson and 'any company [over] which you [i.e., Thomson] exercise control [and] actively manage.'" XL's XO App. at 68.[29] And XL does not challenge the trial court's conclusion that this language "describes TCETVT—a company with no employees or facilities which Thomson 'actively manages.'" *Id.* at 68-69. Thus, XL has effectively conceded that TCETVT is a named insured under its umbrella policies.

XL focuses on the following policy language:

**Insuring Agreements**

    **I.**    **Coverage**

        **A.**    **Coverage A**

> We will pay those sums that the "insured" becomes legally obligated to pay as damages arising out of an "occurrence" which are in excess of the underlying insurance stated in **Schedule A** of this policy. The coverage provisions of the scheduled underlying policies are incorporated as a part of the policy except for (a) Medical Payment, (b) Uninsured or Underinsured

---

[28] We are unpersuaded by XL's attempt to distinguish between a "named insured" and an "additional insured" for purposes of the AICIE and the IEGLE.

[29] Thomson's proposed order, which the trial court adopted nearly verbatim, misquotes the relevant policy language. We address this at greater length below.

Motorist Coverage, (c) any duty to investigate or defend any claim, or to pay for any investigation or defense, (d) the limits of insurance or (e) any other provision that is not consistent with a provision in this policy.

This insurance applies only to "bodily injury", "personal injury", "property damage" or "advertising liability [sic]" which occurs during the policy period.

**B.    Coverage B**

With respect to any loss covered by the terms and conditions of this policy, but not covered as warranted by the underlying policies listed on **Schedule A,** or any other underlying insurance, we will pay on your behalf for loss caused by an "occurrence" which is in excess of the "retained limit" for liability imposed on you by law or assumed by you under contract for "bodily injury", "personal injury", "property damage" or "advertising injury."

This insurance applies only to "bodily injury", "personal injury", "property damage or "advertising injury" which occurs during the policy period.

**II.    Defense Settlement**

For damages covered by this policy, but not covered by any other insurance or underlying insurance, we have these obligations:

A.    We will defend any "suit" seeking damages covered by this policy; but we may investigate, negotiate, and settle any clam or "suit" at our discretion.

B.    We will pay the premium for any bond to release attachments for amounts not exceeding the policy Limits of Insurance, but we are not obligated to apply or furnish those bonds.

XL's XO App. at 120.

76

XL argues, "As a threshold matter, Coverage A only applies to "those sums that the 'Insured' becomes legally obligated to pay." Thus, Coverage A can only apply to sums that Thomson Inc. becomes legally obligated to pay in excess of the scheduled underlying primary coverage." XL's XO Br. at 29. Given that XL has conceded that TCETVT is also an insured, we disagree. And because TCETVT is insured under Coverage A, we need not address XL's arguments regarding Coverage B or the defense settlement provision. Therefore, we affirm the trial court's ruling that TCETVT is an insured under XL's umbrella policies.

**Section 10 – Reasonableness and Necessity of Thomson's Defense Costs**

XL contends that the trial court erred in awarding defense costs on summary judgment, claiming that genuine issues of material fact remain regarding the reasonableness and necessity of those costs. XL complains that

> [t]he trial court overlooked the insufficiency of the materials presented by Thomson and adopted a "market tested" analysis for determining the amount, necessity and reasonableness of the requested fees. However, as acknowledged by the Trial Court, no Indiana court has ever permitted this method for analyzing fee requests. Also, use of this analysis [c]onflicts with the existing Indiana authorities cited … by XL and the other Defendants. In a summary judgment proceeding, it is not appropriate to establish a new legal analysis and to impose newly minted legal liability on a party to a pending lawsuit.

XL's XO Br. at 36 (citations to appendix omitted).

We note, however, that XL had an opportunity to respond to Thomson's arguments on summary judgment in favor of adopting the "market tested" analysis. The trial court was

77

unpersuaded by XL's arguments, as are we. What the Seventh Circuit said about Taco Bell

and its insurer could be said with equal force about Thomson and XL in this case:

> When [Thomson] hired its lawyers, and indeed at all times since, [XL] was vigorously denying that it had any duty to defend – any duty, therefore, to reimburse [Thomson]. Because of the resulting uncertainty about reimbursement, [Thomson] had an incentive to minimize its legal expenses (for it might not be able to shift them); and where there are market incentives to economize, there is no occasion for a painstaking judicial review.…
>
> ....
>
> Furthermore, although [XL's] policy entitled it to assume [Thomson's] defense, in which event [XL] would have selected, supervised, and paid the lawyers for [Thomson] in the [Taiwan Class Action], it declined to do so – gambling that it would be exonerated from a duty to defend – with the result that [Thomson] selected the lawyers. Had [XL] mistrusted [Thomson's] incentive or ability to economize on its legal costs, it could, while reserving its defense that it had no duty to defend, have assumed the defense and selected and supervised and paid for the lawyers defending [Thomson] in the [Taiwan Class Action], and could later have sought reimbursement if it proved that it had indeed had no duty to defend [Thomson]. So presumably it had some confidence in [Thomson's] incentive and ability to minimize legal expenses. We add that the duty to defend would be significantly undermined if an insurance company could, by the facile expedient of hiring an audit firm to pick apart a law firm's billing, obtain an evidentiary hearing on how much of the insured's defense costs it had to reimburse.

*Taco Bell Corp.*, 388 F.3d at 1075-77 (citations omitted).[30] The rationale for the "market tested" analysis is compelling, and we cannot say that the trial court erred in applying it in this case.

Nor can we say that XL rebutted the presumption that Thomson's defense costs are reasonable and necessary. *Cf. Aerojet-Gen. Corp. v. Transport Indem. Co.*, 948 P.2d 909, 924 (Cal. 1997) ("[I]n the exceptional case, wherein the insurer has breached its duty to defend, it is the insured that must carry the burden of proof on the existence and amount of the site investigation expenses, which are then presumed to be reasonable and necessary as defense costs, and it is the insurer that must carry the burden of proof that they are in fact unreasonable or unnecessary."), *modified on denial of reh'g* (1998). Simply stated, XL has presented no relevant facts or citations to authority to persuade us that the trial court erred as a matter of law in finding Pierce's criticisms and opinions unpersuasive. The same is true for the trial court's acceptance of McNiel's affidavit. As such, we find no genuine issues of

---

[30] In its reply brief, XL notes that the Seventh Circuit decisions cited by Thomson "clearly indicated the 'market tested' analysis was adopted as a federal procedural rule of analysis" and that other courts have rejected this analysis. XL's XO Reply Br. at 19 n.11. Be that as it may, we agree with the trial court's adoption of the "market tested" analysis in this case. As the Seventh Circuit observed in *Metavante*, when fees are "paid by a party who had no reassurance of indemnity, … market considerations normally would render unnecessary resort to the time-consuming examination of individual expenses. For the federal courts, such exercises drain the institution of its most valuable resource—time." 619 F.3d at 774. Time is an equally valuable resource in state courts, and the same market considerations apply.

79

material fact regarding the reasonableness and necessity of Thomson's defense costs and therefore affirm the trial court on this issue.[31]

## Section 11 – Prejudgment Interest on XL's Defense Costs

The trial court ruled on the issue of prejudgment interest as follows:

> E.   <u>Thomson is entitled to an award of prejudgment interest</u>
>
> The total costs here are fixed, paid, and undisputed. Thomson is entitled to prejudgment interest at the statutory rate of 8% from the date of payment.[32] In a contract action, such an award merely puts the party suffering a breach in as good a position as it would have been in had no breach occurred. Such an award is not "a matter of discretion." E.g., *Sand Creek Country Club v. CSO Architecture*, 582 N.E.2d 872, 875-76 (Ind. Ct. App. 1991).

XL's XO App. at 69.

Indiana Code Section 34-51-4-7 states, "The court may award prejudgment interest as part of a judgment." In *Bopp v. Brames*, 713 N.E.2d 866 (Ind. Ct. App. 1999), *trans. denied* (2000), this Court said,

> When reviewing a decision regarding an award of prejudgment interest, our standard of review is for an abuse of discretion, focusing on the trial court's threshold determination as to whether the facts satisfy the test for making such an award. The decision to award prejudgment interest rests on a factual determination and this court may only consider the evidence most favorable to the judgment.

---

[31]   XL asserts that "Thomson has presented no reason why it should be entitled to recover costs incurred on behalf of TCETVT." XL's XO Br. at 31. This assertion ignores McNiel's unchallenged opinion that "the defense actions here were all reasonable and necessary to protect all the Thomson entities." XL's XO App. at 66. In light of McNiel's opinion, we also reject XL's assertions regarding the alleged violation of Indiana's anti-assignment rules as to insurance policies and coverage.

[32]   Indiana Code Section 24-4.6-1-102 states, "When the parties do not agree on the rate, interest on loans or forbearances of money, goods or things in action shall be at the rate of eight percent (8%) per annum until payment of judgment."

We note that the crucial factor in determining whether damages in the form of prejudgment interest are allowable is whether the damages were ascertainable in accordance with fixed rules of evidence and accepted standards of valuation. An award of prejudgment interest is proper only where a simple mathematical computation is required. Damages that are the subject of a good faith dispute cannot allow for an award of prejudgment interest.

*Id*. at 872 (citations omitted); *see also Indiana Indus., Inc. v. Wedge Prods., Inc.*, 430 N.E.2d 419, 427 (Ind. Ct. App. 1982) ("[P]re-judgment interest is proper where the trier of fact need not exercise its judgment to assess the amount of damages."), *trans. denied*.

XL argues,

Based on these standards, it is obvious that an award of prejudgment interest was not proper. Thomson's purported damages were not presently ascertainable. John Pierce's affidavit creates multiple issues of fact which required the trier of fact to exercise its judgment to assess the proper amount of attorneys fees to which Thomson was entitled, if any.

XL's XO Br. at 40. As we determined above, the trial court properly concluded that Thomson's defense costs were presumed to be reasonable and necessary and that Pierce's affidavit did not rebut that presumption; in other words, the affidavit did not create a genuine issue of material fact. Therefore, we affirm the trial court's award of prejudgment interest.[33]

---

[33] XL observes that on the same day the trial court issued the XL Defense Costs Order, it also issued an order denying Thomson's motion to hold XL in contempt for failing to defend. In that order, the trial court stated that "Thomson still has to meet its burden of proving that the defense costs incurred were reasonable and necessary before any such costs may be recovered …." XL's XO App. at 87. XL argues, "If the amount, reasonableness and necessity of fees was in dispute and precluded a finding of contempt, it likewise precluded an award of pre-judgment interest." XL's XO Br. at 40. XL ignores that in the contempt order, the trial court specifically found that Thomson had "met its burden of proof on the reasonableness and necessity of defense costs" and denied Thomson's contempt motion because XL "had the right to offer legal argument and expert witness testimony disputing that incurred expenses were reasonable and necessary to Thomson's defense" and therefore did not willfully violate the Duty to Defend Order. XL's XO App. at 87-88.

## Conclusion

To reiterate, we rule on the foregoing issues as follows:

(1)  We deny XL's request to dismiss this appeal.

(2)  We affirm the Duty to Defend Order as finalized by the Allocation Order and the Defense Cost Orders.

(3)  We affirm the trial court's finding of two "occurrences" under the XL and Century policies.

(4)  We affirm the trial court's ruling that Thomson must satisfy the deductible for each occurrence for XL's 2000, 2001, and 2002 primary policies.

(5)  We reverse and remand with instructions to apply the self-insured retentions in XL's 2003, 2004, and 2005 primary policies.

(6)  We reverse the trial court's ruling that the "personal injury" provisions in XL's 2000 primary policy are inapplicable.

(7)  We affirm the trial court's application of a "continuous trigger" to XL's policies but reverse and remand with instructions to use when the disease became reasonably capable of medical diagnosis as the trigger's manifestation point.

(8)  We reverse the trial court's use of an "all sums" allocation method for XL's and Century's policies and remand with instructions to use an appropriate pro rata allocation method.

(9)  We affirm the trial court's ruling that TCETVT and Thomson SA are insureds under XL's primary and umbrella policies.

(10)  We affirm the trial court's ruling regarding the reasonableness and necessity of Thomson's defense costs as to XL.

(11)  And finally, we affirm the trial court's award of prejudgment interest on the defense costs as to XL.

Affirmed in part, reversed in part, and remanded.

BRADFORD, J., concurs.

VAIDIK, C.J., concurs in part and dissents in part with opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

THOMSON INC. n/k/a
TECHNICOLOR USA, INC.,                          )
                                                )
    Appellant-Plaintiff/Cross-Appellee          )
                                                )
        vs.                                  )          No. 49A05-1109-PL-470
                                                )
INSURANCE COMPANY OF NORTH                      )
AMERICA n/k/a CENTURY INDEMNITY                 )
COMPANY, et al.,                                )
                                                )
    Appellees-Defendants/Cross-Appellants,      )
                                                )
        And                                  )
                                                )
XL INSURANCE AMERICA, INC. f/k/a                )
WINTERTHUR INTERNATIONAL                        )
 AMERICA INSURANCE COMPANY,                     )
                                                )
        Appellee-Defendant/Cross-Appellant,  )
                                                )
        And                                  )
                                                )
TRAVELERS PROPERTY CASUALTY                     )
CO., et al.,                                    )
                                                )
        Appellee-Defendant/Cross-Appellant.  )

**VAIDIK, Chief Judge, concurring in part and dissenting in part.**

I applaud the well-written and well-reasoned opinion of my colleagues, and I wholeheartedly concur in all but one respect. I respectfully disagree with my colleagues'

84

conclusion that XL/Century is only liable for the portion of damages that occurred in its policy periods. Rather, I agree with the trial court that the XL/ Century policies' use of the phrase "those sums" instead of "all sums" does not constitute the clear proration language that our Supreme Court in *Dana II* Court noted that insurers needed to use to limit their liability to only those damages that occur in their policy period. I would affirm the trial court's entry of summary judgment in favor of Thomson on this issue.

*Dana II* involved insurance coverage for environmental-cleanup costs in nineteen states where contamination occurred over the course of several years. In *Dana II*, the policies provided that Allstate would pay "*all sums* which [Dana] shall be obligated to pay by reason of the liability . . . imposed upon [Dana] by law . . . for damages because of [personal injury or property damage] . . . caused by an OCCURRENCE. . . ." 759 N.E.2d 1049, 1057 (Ind. 2001) (emphasis added). In determining coverage for liability from personal injury or property damage, "occurrence" was defined as "an accident, event or happening including continuous or repeated exposure to conditions which result[ed], *during the policy period*, in Personal Injury [or] Property Damage . . . neither expected nor intended from the standpoint of the Insured." *Id.* (emphasis added). Our Supreme Court noted that the "policies require[d] Allstate to indemnify Dana for all sums paid as a result of liability arising from any covered accident or event resulting in property damage or personal injury that occurr[ed] during the policy period." *Id.* Allstate, however, contended that it was responsible for only the portion of damages incurred in a particular policy period. *Id.* It argued for a proportional allocation of damages among each triggered policy period. *Id.*

85

The Supreme Court found, however, that there was no language in the coverage grant, including the definitions of "property damage," "personal injury," or "occurrence," that limited Allstate's responsibility to indemnification for liability derived solely for that portion of damages that took place within the policy period. *Id.* at 1058. By the policy's terms, once an accident or event resulting in Dana's liability—an occurrence—took place within the policy period, Allstate must indemnify Dana for "all sums" Dana must pay as a result of that occurrence, subject to the policy limits. *Id.* Accordingly, the Supreme Court held that regardless of whether the damaging effects of an occurrence continued beyond the end of the policy period, if coverage was triggered by an occurrence, it was triggered for "all sums" related to that occurrence. *Id.*

The policy at issue here provides:

**SECTION I – COVERAGES**

**COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**1.     Insuring Agreement**

a. We will pay *those sums* that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. . . .

\* \* \* \* \*

b. This insurance applies to "bodily injury" and "property damage" only if:

(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

86

(2) *The "bodily injury" or "property damage" occurs during the policy period . . . .*

Thomson's AO App. p. 345 (emphases added). The difference between this policy and the policy in *Dana II* is that this policy uses the phrase "those sums" instead of "all sums." Contrary to the majority's implication, both policies use the phrase "during the policy period." *See Dana II*, 759 N.E.2d at 1057 (defining "occurrence" as "an accident, event or happening including continuous or repeated exposure to conditions which results, *during the policy period*, in Personal Injury [or] Property Damage . . . neither expected nor intended from the standpoint of the Insured." (emphasis added)).

I agree with the trial court that the use of the terms "those sums" instead of "all sums" does not change the result and that using "those" instead of "all" does not constitute the clear proration language that our Supreme Court in *Dana II* noted that insurers needed to use to support proration. Accordingly, if XL/Century wanted to require proration of payment to only that portion of bodily injury that took place in a policy period, it should have done so more directly by using careful language. Contrary to the majority, I do not think that simply trading "some" for "all" is "direct[] enough." Slip op. at 60.

Businesses make calculated decisions to purchase insurance to protect against future unknown risks. Insurers and insureds determine the amount of premiums they are willing to offer and pay based upon their assessment of risk. In other words, each calculate the risk and determine the cost based on the potential risks. Long-tail claims, where damages evolve over a long period of time, are one of those risks. There is no dispute that the policies in question here involve long-tail claims. The only question is whether XL/Century may prorate their

87

coverage to apply only to damages occurring in their policy periods.

XL/Century, as the drafters of these policies, were decidedly in the driver's seat when defining the risk that they were insuring with regard to these covered long-tail claims. If XL/Century meant to say that they were liable for those evolving damages incurred only during the period of their policies, they should have said so.

As Thomson points out in its brief, it will be difficult for a court to determine exactly when and in what amount damages occurred. The majority answers this by giving the trial-court judge two main tests to decide upon and "broad discretion in selecting and applying an apportionment method." *Id.* at 64. This is unfair to the insurance companies, Thomson, and its employees. The risk that each of the parties calculated in offering and buying insurance is as uncertain post injury as ever. The majority opinion also has broad-range consequences for future long-tail coverage cases as the risk that each future insurer and insured calculate up front are now subject to change based upon the vicissitudes of 400 trial-court judges who have received little or no direction from us.

For these reasons I agree with *Dana II* and determine that the language of these policies is not specific enough to demand proration of damages. If insurance companies want to limit only those evolving damages that occurred during the life of their policies, then they must be specific so as to give notice to the insureds of what may come.